## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVIN COPPEDGE, MAX THERIAULT, and ESTEBAN CUESTA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE ATHLETIC MEDIA COMPANY and THE NEW YORK TIMES COMPANY,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Dated: September 9, 2024

**LABATON KELLER SUCHAROW LLP**
Guillaume Buell
Michael P. Canty
Carol C. Villegas
Danielle Izzo
Gloria J. Medina
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
E-Mail: gbuell@labaton.com
        mcanty@labaton.com
        cvillegas@labaton.com
        dizzo@labaton.com
        gmedina@labaton.com

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Max S. Roberts
Victoria X. Zhou
1330 Avenue of the Americas, Floor 32
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
        mroberts@bursor.com
        vzhou@bursor.com

*Attorneys for Plaintiffs and the Proposed Class*

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

PARTIES ...................................................................................................................... 3

JURISDICTION AND VENUE .................................................................................... 3

FACTUAL ALLEGATIONS ......................................................................................... 4

I.      History and Overview of the VPPA and VCPA ............................................ 4

II.     The Athletic and the NYT Are Video Tape Service Providers .................... 6

III.    Defendants Intentionally Disclose Video Viewing History and PII to Third
        Parties ............................................................................................................ 7

        A.      Overview of Defendants' Intentional Disclosures to Third Parties ........ 7

        B.      Defendants Disclose Subscribers' PII and Video Viewing History to
                Third Parties ............................................................................................ 10

                1.      Meta (f/k/a Facebook) ............................................................. 10

                2.      Google ...................................................................................... 13

                3.      X (f/k/a Twitter) ....................................................................... 15

                4.      TikTok ....................................................................................... 17

IV.     Defendants Knowingly Disclose Subscribers' Video Viewing History and PII
        For Marketing, Advertising, and Analytics Purposes ......................................... 21

V.      Plaintiffs and Class Members Did Not Consent to Defendants' Disclosures .................. 24

VI.     Experience of Plaintiffs .................................................................................... 25

        A.      Experience Of Plaintiff Davin Coppedge .............................................. 25

        B.      Experience Of Plaintiff Max Theriault .................................................. 26

        C.      Experience Of Plaintiff Esteban Cuesta ................................................ 26

CLASS ALLEGATIONS ............................................................................................ 27

CAUSES OF ACTION ................................................................................................ 30

PRAYER FOR RELIEF .............................................................................................. 33

JURY DEMAND ........................................................................................................ 34

Plaintiffs Davin Coppedge ("Coppedge"), Max Theriault ("Theriault"), and Esteban Cuesta ("Cuesta") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), bring this class action against Defendants The Athletic Media Company ("The Athletic") and The New York Times Company ("the NYT") (collectively, "Defendants") based upon personal knowledge and belief, and upon investigation of counsel.

## INTRODUCTION

1.     The Athletic is a sports news and media video streaming platform owned and operated by the NYT that provides exclusive video content to millions of paid subscribers.  The Athletic's subscribers gain access to exclusive sports news and media content, including coverage of over ten (10) different professional sports and fantasy sports.[1]

2.     Subscribers may access The Athletic's streaming platform through a website or mobile application (an "app").  This platform incorporates several third-party application programing interfaces ("APIs").  APIs allow web and app developers, like The Athletic, to integrate pre-built functionality into their software products free of charge.  Among other things, these APIs allow The Athletic and the NYT to collect and analyze customer data concerning their subscribers to facilitate marketing and engagement efforts.

3.     Defendants incorporated third party APIs into their website.  These APIs were developed by third parties such as, Meta, Google, X, and TikTok (the "Third Parties").

4.     Notably, third party APIs are not completely free—there is a cost.  When web and app developers incorporate third party APIs into their platforms, the customer information developers seek to analyze is automatically disclosed to the third party.

---

[1] *See* The Athletic Homepage, https://www.nytimes.com/athletic/ (last visited Aug. 26, 2024).

5.      The Athletic and the NYT incorporated third party APIs into their streaming platform.  As a result, Third Parties Meta, Google, X, and TikTok received subscriber information that Defendants intended to analyze: video viewing history in connection with personally identifiable information ("PII"), like names, email addresses, and Customer IDs.

6.      By disclosing subscribers' video viewing history in connection with their PII, Defendants provided the Third Parties with information sufficient to identify the specific individuals who watched videos on The Athletic's platform.  For example, The Athletic discloses subscribers' video viewing history, email addresses, first and last names, and unique Customer ID numbers to Meta.

7.      Third parties like Meta, Google, X, and TikTok maintain individual profiles and data about their users.  With this existing user data, the Third Parties were able to match the information transmitted by The Athletic and the NYT to a specific individual using the disclosed PII.

8.      The Video Privacy Protection Act of 1988 ("VPPA") prohibits "video tape service providers," such as Defendants, from knowingly disclosing consumers' PII, including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without the person having expressly given consent in a standalone consent form.  S. Rep. No. 100-599 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342-1, 1988 WL 243503 (Oct. 19, 1988).

9.      Defendants did not request or obtain consent to disclose Plaintiffs' and Class members' video viewing history and PII in compliance with the VPPA.

10.      Accordingly, Defendants' conduct violates the VPPA.

## PARTIES

11.     Plaintiff Coppedge is, and has been at all relevant times, a resident of Massachusetts and has an intent to remain there, and is therefore a citizen of Massachusetts.

12.     Plaintiff Theriault is, and has been at all relevant times, a resident of Massachusetts and has an intent to remain there, and is therefore a citizen of Massachusetts.

13.     Plaintiff Cuesta is, and has been at all relevant times, a resident of New York and has an intent to remain there, and is therefore a citizen of New York.

14.     Defendant The Athletic Media Company, a subsidiary of The New York Times Company, has its principal place of business at 332 Pine Street, Suite 900, San Francisco, CA 94104.  The Athletic develops, owns, and operates the website at issue in this Complaint, which is used throughout the Commonwealth of Massachusetts, the State of New York, and the United States.

15.     Defendant The New York Times Company is a publicly traded company whose principal place of business is located at 242 West 41st Street, New York, NY 10036 (with Principal Executive Office at 620 Eight Avenue, New York, NY 10018).  The NYT develops, owns, and hosts The Athletic's website on the larger *The New York Times* webpage, which is used throughout the Commonwealth of Massachusetts, the State of New York , and the United States.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs' claims under the Wrongful Disclosure of Video Tape Rental or Sale Records ("Video Privacy Protection Act" or "VPPA"), 18 U.S.C. § 2710.

17.     This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d) because this is a proposed class action in which: (1) there are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000,

exclusive of interest, and costs; and (3) Defendants and at least one Class member are domiciled in different states.

18.     This Court has personal jurisdiction over the Defendants because The Athletic, through its website, collected and disseminated personally identifiable in connection with users' video viewing history.  Each Defendant conducts substantial business in this District, and the conduct giving rise to this action arises out of and relates to those business dealings.

19.     Defendants derive substantial revenue from advertising to their users in all fifty (50) states.  Through the collection of users' personally identifying information, Defendants are able to precisely target users with advertising most relevant to each user.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

I.      **HISTORY AND OVERVIEW OF THE VPPA AND VCPA**

21.     The history of the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed Judge Bork's rental history to the *Washington City Paper*, which then published the details of the nominee's rental history.  In response to the ensuing scandal, and with an eye towards the digital future, in 1988 the United States Congress passed the VPPA, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers."  S. Rep. No. 100-599, at 8.  "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

22.     As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin
> Bell or Pat Leahy watch on television or read or think about when
> they are home.  In an area of interactive television cables, the growth
> of computer checking and check-out counters, of security systems
> and telephones, all lodged together in computers, it would be
> relatively easy at some point to give a profile of a person and tell
> what they buy in a store, what kind of food they like, what sort of
> television programs they watch, who are some of the people they
> telephone.  I think that is wrong.

*Id*. (internal ellipses and brackets omitted).

23.     In 2012, Congress amended the VPPA, and in so doing, reiterated the VPPA's

applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow

consumers to watch movies or TV shows on televisions, laptop computers, and cell phones."

Video Privacy Protection Act Amendments Act of 2012, S. Rep. 112-258, at 2, 2012 WL 6742673

(Dec. 20, 2102).

24.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to

any person, personally identifiable information concerning any consumer of such provider."  18

U.S.C. § 2710(b)(1).

25.     PII includes "information which identifies a person as having requested or obtained

specific video materials or services from a video service provider," and which should not be shared

without the person having expressly given consent in a standalone consent form.  18 U.S.C.

§ 2710(a)(3).

26.     A video tape service provider is "any person, engaged in the business, in or

affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette

tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

27.     Here, Defendants failed to properly request or obtain Plaintiffs' consent to disclose

Plaintiffs' and Class members' video viewing history in connection with PII.

28.     In 2014, New York State enacted a statute modeled off, and substantially identical to, the VPPA called the Video Consumer Protection Act ("VCPA"), N.Y. Gen. Bus. Law §§ 670-675, under which Plaintiffs here also bring a claim.

## II.     THE ATHLETIC AND THE NYT ARE VIDEO TAPE SERVICE PROVIDERS

29.     Founded in 1851,[2] the NYT is a print and internet newspaper with over ten (10) million subscribers.[3]  The NYT purchased The Athletic in 2022.

30.     Founded in 2016, The Athletic is a sports news and media video streaming platform.  The Athletic offers exclusive content to subscribers via its website and app.  Millions of subscribers access The Athletic to view exclusive sports news coverage, live sports commentary, and exclusive interviews.[4]

31.     The Athletic offers sports video content concerning over ten (10) different sports with coverage spanning both North America and International regions and including fantasy sports leagues.  While the content varies by sport and topic, The Athletic's video streaming content is materially the same across its website and app platforms.

32.     Individuals may access The Athletic's streaming content through: (1) a standalone subscription; (2) the NYT All Access subscription; or (3) the NYT Home Delivery subscription.[5] A standalone subscription costs $1.99 per month for the first twelve (12) months and thereafter

---

[2] *History*, THE NEW YORK TIMES, https://www.nytco.com/company/history/ (last visited Aug. 22, 2024).

[3] *The New York Times Company Reports First-Quarter 2024 Results*, THE NEW YORK TIMES COMPANY (May 8, 2024) at 13, https://nytco-assets.nytimes.com/2024/05/Q124-Earnings-Release-Final-For-Distribution-rhHXIYbe.pdf.

[4] *About Us*, THE ATHLETIC, https://www.nytimes.com/athletic/about/ (last visited Aug. 22, 2024).

[5] *Id.* (the website also offers a free newsletter.).

$7.99 per month.[6]  A NYT All Access subscription costs $5.00 per week for the first six (6) months

and thereafter $6.25 per week.[7]  A NYT Home Delivery subscription, which includes digital access

at the same level as an All Access subscription, and also includes home delivery of printed

materials, costs anywhere from $10 to $20 per week, depending on frequency of delivery.[8]

33.     The NYT benefitted from, amongst other things, The Athletic's user data, which

led to increased ad revenues for the NYT and offset lower ad revenue from the NYT main page.[9]

Indeed, The Athletic has grown the NYT's revenues by at least 33% in the first quarter of 2024.[10]

## III.     DEFENDANTS INTENTIONALLY DISCLOSE VIDEO VIEWING HISTORY AND PII TO THIRD PARTIES

### A.     Overview of Defendants' Intentional Disclosures to Third Parties

34.     Unbeknownst to Plaintiffs and Class Members, The Athletic, and by extension the

NYT, knowingly and intentionally disclosed (and continues to disclose) subscribers' PII in

connection with records of every video viewed by the user to third parties such as, Meta, Google,

X, and TikTok.

---

[6] *Checkout*, THE ATHLETIC, https://www.nytimes.com/athletic/checkout2/welcomeoffer/ (last visited Aug. 22, 2024).

[7] All Access Subscription Page, THE NEW YORK TIMES, https://www.nytimes.com/subscription/all-access (last accessed Aug. 22, 2024).

[8] Home Delivery Subscription Page, THE NEW YORK TIMES, https://www.nytimes.com/subscription/home-delivery (last visited Aug.22, 2024) (home delivery is not available in all U.S. zip codes; for new subscribers, the rates vary from $5 per week to $10 per week during the first year).

[9] *The New York Times Company Reports First-Quarter 2024 Results*, *supra* n.2, at 1, 4 ("Digital advertising revenues increased 2.9 percent year-over-year largely as a result of higher revenues from display advertising at The Athletic and creative services, partially offset by lower revenue from display advertising at The New York Times Group 'NYTG' and podcast advertising. …. Digital advertising revenues increased due to higher revenues from display advertising at The Athletic[.]").

[10] *Id.* at 6 (noting also that "[a]dvertising revenues increased 37.5 percent to $5.7 million from $4.2 million in the first quarter of 2023, primarily due to higher revenues from display advertising").

35.    Defendants transmit subscribers' video viewing history and PII to Third Parties through multiple APIs embedded in its website.[11]   APIs "allow[] developers to integrate data, services[,] and capabilities from other applications …. Application owners [like Defendants] can also share or market data and functions to business partners or third parties."[12]

36.    The use of APIs is free to website and mobile application developers, such as Defendants.  However, there is a cost.  By incorporating Third Party APIs into websites and mobile applications, like The Athletic, website and mobile app developers transmit users' information to Third Parties.

37.    Defendants intentionally incorporated and maintained Third Party APIs in The Athletic's platform (*i.e.*, website or mobile application) to take advantage of the marketing, advertising, and analytical benefits provided by the Third Parties.  As a result, Defendants disclosed subscribers' PII to the Third Parties through the embedded APIs.  Because Defendants control The Athletic, only Defendants could have made the decision to incorporate the Third Party APIs into The Athletic's platform.

38.    Specifically, as described further *infra* § III.B., Defendants surreptitiously transmit The Athletic's subscribers' video viewing history as well as other personally identifying information, including email, customer ID, and Facebook account identifier, to the Third Parties. The Third Parties benefit from the information they receive because the subscribers' information

---

[11] The Athletic application for iOS and Android may also transmit PII and video viewing history to the Third Parties through multiple APIs.  *See, e.g.*, The Athletic, APP STORE, https://apps.apple.com/us/app/the-athletic-sports-news/id1135216317 (last visited Aug. 22, 2024); The Athletic, GOOGLE PLAY STORE, https://play.google.com/store/apps/details?id=com.theathletic&hl=en_US (last visited Aug. 22, 2024).

[12] *What is an API (application programming interface)*, IBM, https://www.ibm.com/cloud/learn/api (last visited Aug. 22, 2024).

can be used to improve their advertising businesses and, where applicable, to train their machine learning models.

39.     PII includes "information which identifies a person as having requested or obtained specific video materials or services from a video service provider," and which should not be shared without the person having expressly given consent in a standalone consent form.  18 U.S.C. § 2710(a)(3); N.Y. Gen. Bus. Law § 672(3).

40.     PII is not limited to names and social security numbers.  An email address is routinely recognized as PII because it is a unique string of characters which designates a specific electronic mailbox.  Courts and experts agree[13] that an ordinary person may use an email address to uniquely identify another individual, especially because multiple services enable individuals with internet access and a credit card to look up the individual associated with a particular email address.[14]  Even in hashed form,[15] email addresses are traceable to individuals.

---

[13] *See* Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII"); *2020 NAI Code of Conduct*, NETWORK ADVERTISING INITIATIVE, (2020), at 19 https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (last visited Aug. 22, 2024) (identifying email as PII); *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of 'information that identifies an individual.' They can 'prove' or 'establish the identity of' an individual.") (citation omitted).

[14] *See, e.g.*, BEENVERIFIED, www.beenverified.com (last visited Aug. 22, 2024) (offering "Email Lookup" and promising to "provide users access to billions of records from leading sources").

[15] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Federal Trade Commission (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data *is risky at best, and usually wrong.*") (emphasis added); *No, Hashing Still Doesn't Making Your Data Anonymous*, Federal Trade Commission (July 24, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized.").

41.     Thus, transmission of an email address is the transmission of PII for the purposes of both the VPPA and VCPA.

42.     Customer IDs are also routinely recognized as PII.  Customer IDs are unique strings of numbers associated with particular consumers.  Customer IDs are sent to advertisers and other third parties to allow third parties to track user activity across various websites, apps, platforms, and devices.  These identifiers attach to devices and generally cannot be changed.  Using publicly available resources, a Customer ID can track a user's movements, habits, and activity on mobile applications.[16]  Put together with other information, a Customer ID serves as "the passport for aggregating all of the data about a user in one place."[17]

43.     Because a Customer ID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences.  These inferences, combined with publicly available tools, make Customer IDs identifiers that sufficiently permit an ordinary person to identify a specific individual, and thus, they constitute PII for the purposes of the VPPA and VCPA.

**B.     Defendants Disclose Subscribers' PII and Video Viewing History to Third Parties**

      **1.     Meta (f/k/a Facebook)**

---

[16] Thomas Tamblyn, *You Can Effectively Track Anyone, Anywhere Just By The Adverts They Receive*, HUFFPOST (Oct. 19, 2017), https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5.

[17] Willie Boag, *Trend Report: Apps Oversharing Your Advertising ID*, IDAC, https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/ (last visited Aug. 28, 2024).

44.    Meta (f/k/a Facebook), headquartered in Menlo Park, CA, was founded in 2004.[18] Meta is a technology company with over 3 billion users globally across its social media platforms, which include Instagram and Facebook.[19]  Meta is also the developer of an artificial intelligence ("AI") based assistant referred to as "Meta AI."[20]  Meta has a quarterly revenue of almost $40 billion.[21]

45.    Meta develops various "business tools" for web and app developers.[22]  These are free tools that provide web and app developers with functionality for their platforms as well as insights about users for advertising and customer engagement.  In exchange for the free use of its tools, Meta automatically receives user data associated with its embedded business tools.

46.    Defendants intentionally incorporated and continue to maintain Meta's analytics technology, including the Meta Pixel, in The Athletic's website.  Figure 1 (below) shows the Meta Pixel code embedded in The Athletic's website.

---

[18]   *Introducing Meta: A Social Technology Company*, META (Oct. 28, 2021), https://about.fb.com/news/2021/10/facebook-company-is-now-meta/.

[19]  *Meta Fast Facts*, CNN (Jan. 18, 2024), https://www.cnn.com/2014/02/11/world/facebook-fast-facts/index.html.

[20]  *Technologies that bring the world closer together*, META, https://about.meta.com/technologies/ (last visited Aug. 22, 2024) ("Meet your new assistant: Meta AI, built with Llama 3").

[21]  *Meta Reports First Quarter 2024 Results*, META INVESTOR RELATIONS (Apr. 24, 2024), https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-First-Quarter-2024-Results/default.aspx.

[22]   The Meta Business Tools, FACEBOOK HELP CENTER, https://www.facebook.com /help/331509497253087/?helpref=uf_share (last visited Aug. 26, 2024).

Figure 1

URL: https://www.facebook.com/tr/
URL PARAM:
  id: 207679059578897
  ev: SubscribedButtonClick
  dl: https://theathletic.com/video/29-scherzer/
  rl:
  if: false
  ts: 1712003906131
  cd[buttonFeatures]:
{"classList":"video-red-filled-rounded-button
video-series-button","destination":"","id":"","imageUrl":"","
innerText":"▶ START
WATCHING","numChildButtons":0,"tag":"a","type":null,"name":""
}
  cd[buttonText]: ▶ START WATCHING
  cd[formFeatures]: []
  cd[pageFeatures]: {"title":"Max Scherzer: Pitch Perfect -
The Athletic"}
  cd[parameters]: []
  sw: 1920
  sh: 1200
  ud[external_id]:
53c63aaefd1ce4425a0510c99c6e35ce3f353ac164503be1056591ec9afdd
789
  v: 2.9.151
  r: stable
  ec: 3
  o: 4126
  fbp: fb.1.1712003704414.603325810
  cs_est: true
  ler: empty
  cdl: API_unavailable
  it: 1712003904241
  coo: false
  dpo:
  es: automatic
  tm: 3
  rqm: GET

URL: https://www.facebook.com/tr/
URL PARAM:
  id: 207679059578897
  ev: Purchase
  dl:
https://theathletic.com/checkout2/welcomeoffer/?checkout_entry
_point=universal_nav_CTA
  rl:
https://theathletic.com/?access_token=15426180&redirected=1
  if: false
  ts: 1712003799755
  cd[currency]: USD
  cd[value]: 7.99
  cd[em]: beegoodkay@gmail.com
  cd[external_id]: sub_1P0raqFXytG4TfYqPVDYoscI
  sw: 1920
  sh: 1200
  ud[external_id]:
74234e98afe7498fb5daf1f36ac2d78acc339464f950703b8c019892f982b9
0b
  v: 2.9.151
  r: stable
  ec: 6
  o: 4126
  fbp: fb.1.1712003704414.603325810
  ler: empty
  cdl: API_unavailable
  it: 1712003730633
  coo: false
  eid: Purchase15426180
  rqm: GET

47.     Figure 1 also demonstrates that Defendants disclose subscribers' video viewing history and PII to Meta.  In the above example, the video title, "Max Scherzer: Pitch Perfect – The Athletic," was transmitted to Meta along with the URL for the video.  The disclosure also includes the event "START WATCHING," showing the user actually watched the video.

48.     Through Meta's analytics technology, like the Meta Pixel, Defendants disclose subscribers' PII.  Specifically, Defendants disclosed subscribers' email addresses, first and last names, and unique Customer ID numbers to Meta.  For the reasons stated in ¶¶26, 40-44, this information constitutes PII.

49.     Meta is able to match The Athletic's users' information it receives to existing data Meta has amassed from its other platforms, including Facebook, without subscribers' knowledge.[23]

---

[23] *See* Lorenzo Franceschi-Bicchierai, *Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document*, VICE, (Apr. 26, 2022), https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.

50.     Specifically, Meta's business is founded upon data driven advertising which "sits at the center of [its] monetization strategy and is the engine that powers Facebook's growth."[24]  To accomplish this core task, Meta's systems collect, store, and use scores of user data from across platforms—including third party data, first party data, slowly changing dimension.[25]

### 2.     Google

51.     Google, headquartered in Mountain View, CA, was founded in 1995.  Google is an internet and cloud services company with over $80 billion in quarterly revenue, derived mostly from advertising.[26]  Google offers a variety of technology products and services to hundreds of millions of users, including the Google search engine, Gmail, Google Maps, YouTube, and Android.

52.     As part of its technology offerings, Google develops several analytics tools for use by web and app developers.  Google allows web and app developers to incorporate its analytics tools into their platforms free of charge for the purposes of gaining customer insights, measuring customer interactions, and optimizing marketing performance.  In exchange for the free use of its tools, Google automatically receives user data associated with its embedded business tools.

53.     Defendants intentionally incorporated and continue to maintain Google's analytics technology, including Google's DoubleClick tools and Google Ad Services, in The Athletic website.  Figures 2 and 3 (below) are excerpts of the transmissions that Defendant disclosed to DoubleClick and Google Ad Services, respectively, through their respective APIs.

---

[24] *Id.*

[25] *Id.*

[26] Revenue of Google from 1st quarter 2008 to 2nd quarter 2024, Statista, https://www.statista.com/statistics/267606/quarterly-revenue-of-google/ (last visited Aug. 26, 2024).

Figure 2

Figure 3

54.     Figures 2 and 3 also demonstrate that Defendants disclose subscribers' video viewing history and PII to Google.  In the above examples, the video title, "Max Scherzer: Pitch Perfect – The Athletic," was transmitted to Google along with the URL for the video.

55.     Through Google's analytics technology, like DoubleClick and Google Ad Services, Defendants disclose subscribers' PII.  Specifically, Defendants disclosed subscribers' email addresses and unique Customer ID numbers to Google.  For the reasons stated in ¶¶ 26, 40-44, this information constitutes PII.

56.     Google is able to match The Athletic's subscriber information it receives to existing data that Google has amassed from its other platforms, including the Google search engine and Gmail, without subscribers' knowledge.[27]  This allows Google to identify each unique subscriber to The Athletic based on a variety of different data points.

### 3.     X (f/k/a Twitter)

57.     X (f/k/a Twitter), headquartered in San Francisco, CA, was founded in 2006.  X is a global online social media platform that derives most of its revenue from advertising. [28]  In 2023, X's revenue totaled an estimated $2.5 billion.[29]

58.     In addition to its social media offerings, X develops several analytics tools for use by web and app developers.  X allows web and app developers to incorporate its analytics tools into their platforms free of charge for the purposes of gaining customer insights, measuring

---

[27] *See* Franceschi-Bicchierai, *supra* n.23.

[28] X (formerly Twitter), CRUNCHBASE, https://www.crunchbase.com/organization/twitter (last visited Aug. 26, 2024).

[29] Kurt Warner, *Musk's X 2023 Ad Sales Projected to Slump to About $2.5 Billion*, BLOOMBERG (Dec. 12, 2023), https://www.bloomberg.com/news/articles/2023-12-12/musk-s-x-2023-ad-sales-projected-to-slump-to-about-2-5-billion; *see also* Mansoor Iqbal, Twitter Revenue and Usage Statistics (2024), BUSINESS OF APPS (Feb. 22, 2024), https://www.businessofapps.com /data/twitter-statistics/ ("75% of Twitter's revenue came from advertising in 2023").

customer interactions, and optimizing marketing performance.  In exchange for the free use of its

tools, X automatically receives user data associated with its embedded business tools.

59.     Defendants  intentionally  incorporated  and  continue  to  maintain  X's  analytics

technology in The Athletic website.  Figure 4 (below) depicts excerpted network transmissions

from Defendants to X via the X API.

Figure 4

60.     Figure 4 also demonstrates that Defendants disclose subscribers' video viewing

history and personal identifiers to X.  In the above screenshot, the video URL for the video titled,

"Max Scherzer: Pitch Perfect – The Athletic," was transmitted to X:

61.     The screenshotted transmission also depicts Defendants disclosing to X a user's

hashed email address:

62.    X is able to match The Athletic's users' information to existing data X has amassed from its social media platforms without subscribers' knowledge. [30]  There are a number of commonly-used methods to decrypt hashed emails including, for instance, a "dictionary attack."[31]

63.    Notably, even an ordinary person could find which disclosed video a user watched. A simple Google search of the video's title in the disclosed Universal Resource Locator ("URL"), here "29 scherzer," along with the words "The Athletic" brings up the user's watched video as the first result, as can be seen in the following Figure 5:[32]

Figure 5



### 4.    TikTok

64.    TikTok, owned by Chinese parent company ByteDance Ltd., launched in 2017 and is headquartered in both Los Angeles, CA and Singapore.  TikTok represents that it is "the leading

---

[30] *See* Franceschi-Bicchierai, *supra* n.23.

[31]  SHA256 Encrypt/Decrypt, 100L5, https://10015.io/tools/sha256-encrypt-decrypt#google _vignette (last visited Aug. 29, 2024) (defining dictionary attacks as "[u]s[ing] a predefined list or database").

[32] Google search results for "the athletic 29 scherzer", GOOGLE, https://www.google.com/ search?q=the+athletic+29+scherzer&rlz=1C1RXQR_enUS1074US1074&oq=the+athletic+29+s cherzer&gs_lcrp=EgZjaHJvbWUyCQgAEEUYORigAdIBCDQ0MTFqMGo0qAIAsAIB&sourc eid=chrome&ie=UTF-8 (last visited Aug. 28, 2024).

destination for short-form mobile video[.]"[33]  The company's app has over one billion users and monetizes its data for advertising purposes—its main source of revenue.[34]  Last year, TikTok's revenue totaled $16 billion in the United States alone.[35]

65.    In addition to its social media offerings, TikTok develops several analytics tools for use by web and app developers.  TikTok allows web and app developers to incorporate its analytics tools into their platforms free of charge for the purposes of gaining customer insights, measuring customer interactions, and optimizing marketing performance.  In exchange for the free use of its tools, TikTok automatically receives user data associated with its embedded business tools.

66.    Defendants intentionally incorporated and continue to maintain the TikTok API that is integrated to The Athletic website.  Figure 6 (below) shows Defendants' network transmissions of a users' PII to TikTok through the TikTok API.

---

[33] *About TikTok*, TikTok, https://www.tiktok.com/about?lang=en (last visited Aug. 23, 2024).

[34] Mansoor Iqbal, *TikTok Revenue and Usage Statistics (2024)*, Business of Apps (July 8, 2024), https://www.businessofapps.com/data/tik-tok-statistics/; *see also* NewFronts '24: Introducing New Premium Ad Solutions for Marketers, TikTok Community (May 2, 2024), https://newsroom.tiktok.com/en-us/newfronts-24-introducing-new-premium-ad-solutions-for-marketers; Zheping Huang, *TikTok Has a Few Main Ingredients for Making Money*, Bloomberg (June 28, 2022), https://www.bloomberg.com/news/newsletters/2022-06-28/how-does-tiktok-make-money-app-relies-on-a-few-main-ingredients.

[35] *TikTok's US Revenue Hits $16 bln as Washington Threatens Ban, FT Reports*, Reuters (Mar. 15, 2024), https://www.reuters.com/technology/tiktoks-us-revenue-hits-16-bln-washington-threatens-ban-ft-reports-2024-03-15/#:~:text=TikTok%27s%20US%20revenue%20hits%20%24 16%20bln%20as%20Washington%20threatens%20ban%2C%20FT%20reports,-By%20Reuters &text=March%2015%20(Reuters)%20%2D%20China%27s,Financial%20Times%20reported%2 0on%20Friday.

Figure 6

URL: https://analytics.tiktok.com/api/v2/pixel/act
PostData PARAM:
  message_id: messageId-1712003904797-6273750086695
  event_id:
  is_onsite: False
  timestamp: 2024-04-01T20:38:24.797Z
  sdk_env: external
  jsb_status: 2
  anonymous_id: KnGIulsU0-mJ34Htjc6cg4ElmRT
  code: CNFICJJC77U0U278T4VG
  runtime: 1
  codes: CNFICJJC77U0U278T4VG
  url: https://theathletic.com/video/29-scherzer/
  referrer:
  name: pixel.js
  version: 2.1.33
  platform: pc
  session_id:
524e9de2-f067-11ee-afa0-08c0eb80308c::6D7NFF_VKhp9vgNrWRWZ
  pageview_id: pageId-1712003904556-3525924515720
  variation_id: default
  userAgent: Mozilla/5.0 (Macintosh; Intel Mac OS X
10_15_7) AppleWebKit/537.36 (KHTML, like Gecko)
Chrome/123.0.0.0 Safari/537.36
  index: 10  action: Metadata
  page_trigger: PageView
  open_graph:
{"twitter:card":"summary_large_image","twitter:site":"@TheA
thletic","twitter:creator":"@TheAthletic","twitter:title":"
Watch Max Scherzer: Pitch Perfect - The
Athletic","twitter:description":"Regarded as one of the
greatest and most intimidating pitchers of all time, \"Mad
Max\" now has a World Series ring to add to his three Cy
Young awards. But it almost didn't happen. This is the
untold story of how he rose from the dead to take the mound
in Game
7.","twitter:image":"https://theathletic-promos.s3-us-west-
2.amazonaws.com/video/Scherzer_Hero.jpg","og:url":"https://
theathletic.com/video/29-scherzer/","og:site_name":"The
Athletic","og:title":"Watch Max Scherzer: Pitch Perfect -
The Athletic","og:description":"Regarded as one of the
greatest and most intimidating pitchers of all time, \"Mad
Max\" now has a World Series ring to add to his three Cy
Young awards. But it almost didn't happen. This is the
untold story of how he rose from the dead to take the mound
in Game
7.","og:image":"https://theathletic-promos.s3-us-west-2.ama
zonaws.com/video/Scherzer_Hero.jpg"}

URL: https://analytics.tiktok.com/api/v2/pixel
PostData PARAM:
  event: EnrichAM
  message_id:
messageId-1712003799798-5949130973360-CNFICJJC77U0U278T4
VG
  event_id:
  is_onsite: False
  timestamp: 2024-04-01T20:36:39.798Z
  sdk_env: external
  jsb_status: 2
  anonymous_id: KnGIulsU0-mJ34Htjc6cg4ElmRT
  email:
428c0775ac7679dc5c288d4fe6af81c25fd59cdc2184e627cbfc9e82
9d4e2126
  code: CNFICJJC77U0U278T4VG
  runtime: 1
  url:
https://theathletic.com/checkout2/welcomeoffer/?checkout
_entry_point=universal_nav_CTA
  referrer:
https://theathletic.com/?access_token=15426180&redirecte
d=1
  name: pixel.js
  version: 2.1.33
  platform: pc
  session_id:
524e9de2-f067-11ee-afa0-08c0eb80308c::6D7NFF_VKhp9vgNrWR
WZ-CNFICJJC77U0U278T4VG
  pageview_id:
  pageId-1712003730822-9074072170316-CNFICJJC77U0U278T4VG
  variation_id: default
  userAgent: Mozilla/5.0 (Macintosh; Intel Mac OS X
10_15_7) AppleWebKit/537.36 (KHTML, like Gecko)
Chrome/123.0.0.0 Safari/537.36
  email_is_hashed: plain_email plain_mdn_email
  sha256_email: empty_value
  phone_is_hashed: empty_value
  sha256_phone: empty_value
  label: valid

67.     Figure 6 also demonstrates that Defendants disclose subscribers' video viewing history and PII to TikTok.  In the above example, the video title, "Max Scherzer: Pitch Perfect – The Athletic," was transmitted to TikTok along with the URL and a description for the video.

url: https://theathletic.com/video/29-scherzer/
referrer:
name: pixel.js
version: 2.1.33
platform: pc
session_id:
524e9de2-f067-11ee-afa0-08c0eb80308c::6D7NFF_VKhp9vgNrWRWZ
pageview_id: pageId-1712003904556-3525924515720
variation_id: default
userAgent: Mozilla/5.0 (Macintosh; Intel Mac OS X
10_15_7) AppleWebKit/537.36 (KHTML, like Gecko)
Chrome/123.0.0.0 Safari/537.36
index: 10  action: Metadata
page_trigger: PageView
open_graph:
{"twitter:card":"summary_large_image","twitter:site":"@TheA
thletic","twitter:creator":"@TheAthletic","twitter:title":"
Watch Max Scherzer: Pitch Perfect - The
Athletic","twitter:description":"Regarded as one of the
greatest and most intimidating pitchers of all time, \"Mad
Max\" now has a World Series ring to add to his three Cy
Young awards. But it almost didn't happen. This is the
untold story of how he rose from the dead to take the mound
in Game
7.","twitter:image":"https://theathletic-promos.s3-us-west-
2.amazonaws.com/video/Scherzer_Hero.jpg","og:url":"https://
theathletic.com/video/29-scherzer/","og:site_name":"The
Athletic","og:title":"Watch Max Scherzer: Pitch Perfect -
The Athletic","og:description":"Regarded as one of the
greatest and most intimidating pitchers of all time, \"Mad
Max\" now has a World Series ring to add to his three Cy
Young awards. But it almost didn't happen. This is the
untold story of how he rose from the dead to take the mound
in Game
7.","og:image":"https://theathletic-promos.s3-us-west-2.ama

68.     Defendants also disclose subscribers' email addresses and unique Customer ID numbers to TikTok.  In the excerpted network transmission below, the user's hashed email address is "428c0775ac7679dc5c288d4fe6af81c25fd59cdc2184e627cbfc9e829d4e2126," and the user's unique customer ID is "15426180."

anonymous_id: KHo101500-mbb4ntjc0cg4ZiNRT
email:
428c0775ac7679dc5c288d4fe6af81c25fd59cdc2184e627cbfc9e82
9d4e2126
code: CNFICJJC77U0U278T4VG
runtime: 1
url:
https://theathletic.com/checkout2/welcomeoffer/?checkout
_entry_point=universal_nav_CTA
referrer:
https://theathletic.com/?access_token=15426180&redirecte

69.     TikTok is able to match The Athletic's users' information it receives to existing data TikTok has amassed from its social media platform without subscribers' knowledge.[36]

## IV.     DEFENDANTS KNOWINGLY DISCLOSE SUBSCRIBERS' VIDEO VIEWING HISTORY AND PII FOR MARKETING, ADVERTISING, AND ANALYTICS PURPOSES

70.     Each of the Third Parties provides web and app development tools free of charge to developers like Defendants.  By incorporating and maintaining the Third Party APIs into The Athletic's streaming platform, Defendants sought to optimize their marketing efforts in exchange for the disclosure of their subscribers' video viewing history and PII.

71.     Web and app developers seeking to use and benefit from Third Party APIs must affirmatively choose to incorporate and maintain the APIs in their websites and/or mobile applications to maintain the marketing, analytics, and analysis benefits that these APIs provide. This simultaneously ensures that the Third Parties have ongoing access to a developer's customer data.

72.     The Third Parties require web and app developers, like Defendants, to agree to specific terms of use and/or terms of service when incorporating APIs.[37]  Thus, web and app

---

[36] *See* Franceschi-Bicchierai, *supra* n.23.

[37] *See*, *e.g.*, *Meta Platform Terms*, META, https://developers.facebook.com/terms/ dfc_platform_terms/ (last visited Aug. 22, 2024); *Google Ads API Terms and Conditions*, GOOGLE ADS, https://developers.google.com/google-ads/api/terms (last visited August 23, 2024); *Google Marketing Platform Advertising Products - Service Specific Terms*, GOOGLE MARKETING PLATFORM, https://marketingplatform.google.com/intl/en_us/about/ads_platforms/gmp/ advertising/terms/ (last visited Aug. 22, 2024); DFP API Terms and Conditions, GOOGLE, https://www.google.com/intl/en_ALL/doubleclick/tos/dfp-api-terms.html (last visited Aug. 22, 2024); *TikTok Developer Terms of Service*, TIKTOK, https://www.tiktok.com/legal/page/ global/tik-tok-developer-terms-of-service/en (last accessed Aug. 22, 2024); *Developer Agreement and Policy*, X DEVELOPER PLATFORM, https://developer.x.com/en/developer-terms/agreement-and-policy (last accessed Aug. 22, 2024).

developers are on notice of the conditions of use when they affirmatively incorporate APIs into their platforms.

73.     Here, Defendants affirmatively chose to incorporate and maintain the Third Party APIs in their website and, possibly, their mobile app.  Because Defendants were responsible for the design and construction of The Athletic's website, they are the only parties who could have incorporated the Third Party APIs.

74.     Moreover, upon information and belief, in order to incorporate Third Party APIs, Defendants had to agree to the Third Parties' API/analytics service terms of use.

75.     The Athletic and the NYT chose to incorporate and maintain the Third Party APIs for the purpose of gaining marketing and advertising insights as advertised on each of the Third Parties' websites.

76.     For example, Meta brands itself as a company that "builds technologies that help people connect, find communities and grow businesses."[38]  Specifically, Meta holds itself out as a platform that can help businesses "[m]aximize [marketing] campaign results and simplify the set-up process with advanced ad creation tools," "[g]et ads to people most likely to be interested in your products or services with automated targeting tool," "[a]ccess advanced marketing performance tracking with detailed overviews of audience behavior," and "[s]ee faster results in fewer steps with AI-enabled tools that generate ads your customers want to see."[39]

77.     Both Google's DoubleClick and Google Ad Services provide web and app developers with the ability to analyze consumer data, measure the performance of marketing campaigns, and target specific users for advertisements.  Google touts its ability to "more

---

[38]*About*, META, https://about.meta.com/ (last visited Aug. 22, 2024).

[39] *Move your business forward with Meta technologies*, META FOR BUSINESS, https://business.meta.com/?locale=en_US (last visited Aug. 22, 2024).

effectively create, manage and grow high-impact digital marketing campaigns … including

trafficking and reporting."[40]

78.     X (f/k/a Twitter) also encourages developers to use the X APIs (including "X API

v2") to "[c]urate and manage lists of accounts," and "uncover insights."[41]  The X APIs are aimed

at conversion tracking to help a business determine if its advertising strategies are effective.  To

that end, the X APIs "pass data back to X and help enable user attribution. It does this by matching

conversion data to an X user, using available identifiers like cookie IDs, Click ID or email.  The

X Pixel allows advertisers to put a piece of code on the website to send conversion data to X.  The

Conversion API allows advertisers to send conversion data directly from a server to X."[42]

79.     TikTok is not only a social media platform, but also a business tool—it offers

services like "TikTok Ads Manager" that "give[s businesses] all the features [they] need to launch

effective ads, drive sales and measure [your ad] performance."[43]  This Ads Manager program

offers and API known as the "TikTok Pixel" which is "a piece of code that [a developer] can place

on [its] website that allows [it] to share website events with TikTok.  The Pixel can be used with

---

[40] *See DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/
2727482?hl=en (last visited Aug. 22, 2024).

[41] *See X API*, X DEVELOPER PLATFORM, https://developer.x.com/en/products/twitter-api  (last
visited Aug. 26, 2024).

[42] *About Conversion Tracking*, X BUSINESS, https://business.x.com/en/help/campaign-
measurement-and-analytics/conversion-tracking-for-websites/about-conversion-tracking.html
(last visited Aug. 22, 2024).

[43] *Grow your Business with TikTok ads*, TIKTOK FOR BUSINESS, https://getstarted.tiktok.com
/ttvalue?attr_source=bing&attr_medium=search-br-ad&attr_adgroup_id=1338107028591511&
attr_term=tik%20tok%20ads%20manager&msclkid=fa4d9df8873214f940affb757bd79e65&lang
=en-US (last visited Aug. 22, 2024).

any TikTok for Business tools to: [m]easure traffic on [the] website[,] [m]easure ad campaign performance[, and o]ptimize your campaigns and find new customers[.]"[44]

80.     The services described in paragraphs ¶¶75-79 help Defendants further monetize The Athletic's subscriber base and maximize revenue by collecting and disclosing as much PII as possible to Third Parties to increase advertising analytics and revenues.  It is no coincidence that, as noted above, The Athletic has grown the NYT's revenues by at least 33% in the first quarter of 2024,[45] an increase that is largely fueled by Defendants' monetization of its customer base for the purpose of advertising.

## V.     PLAINTIFFS AND CLASS MEMBERS DID NOT CONSENT TO DEFENDANTS' DISCLOSURES

81.     Plaintiffs and Class members did not consent to Defendants' disclosure of their video viewing history and PII.

82.     The VPPA and VCPA both require Defendants to obtain informed, written consent from subscribers before disclosing their video viewing history and PII with third parties.

83.     As set forth in 18 U.S.C. § 2710(b)(2)(B)(i)-(ii), "informed, written consent" must be (1) "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;" and (2) "at the election of the consumer— (I) is [either] given at the time the disclosure is sought; or (II) is given in advance for a set period of time, not to exceed [two] years or until consent is withdrawn by the consumer, whichever is sooner[.]"  As set forth in N.Y. Gen. Bus. Law § 672(6), "informed, written consent" " must be (1) "in writing in at least ten

---

[44] *About TikTok Pixel*, Tik Tok Business Help Center, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Aug. 22, 2024).

[45] Sean Keeley, *The Athletic sees subscriber and revenue growth, profitability remains elusive*, Awful Announcing (May 11, 2024), https://awfulannouncing.com/athletic/subscriber-revenue-growth-profitability-new-york-times.html.

point bold face type, affixed to any membership, subscriber or rental agreement between the consumer and the video tape service provider, and shall be posted on a sign in full and clear view of the consumer at the point of rental transaction[;]" and (2) be drafted to include the language provided by N.Y. Gen. Bus. Law § 672(6). The Athletic does not provide any separate written consent form at the time of sign up, or otherwise in a form that meets these requirements.

84.     Defendants failed to comply with the VPPA and VCPA by failing to obtain the informed, written consent of Plaintiffs and the Class to share their video viewing history and PII with third parties. Therefore, Defendants failed to obtain informed, written consent in compliance with VPPA and VCPA.

## VI.     EXPERIENCE OF PLAINTIFFS

### A.     Experience Of Plaintiff Davin Coppedge

85.     In or about 2020, Plaintiff Coppedge created an account with the NYT. In order to set up a subscription, he provided his full name, email address, and payment information, including his billing address.

86.     In the first half of 2024, Plaintiff Coppedge deleted his NYT account.

87.     While he was still a NYT subscriber, Plaintiff Coppedge watched pre-recorded videos on The Athletic about his favorite basketball team, the Boston the Celtics, and various other Boston sports teams, whenever he would receive an email prompting him to do so, or a notification from The Athletic relating to those teams would pop up on his iPhone 13 Pro, which he still currently owns. To the best of his recollection, Plaintiff Coppedge would also watch pre-recorded videos on his laptop, using both Chrome and Safari web browsers. These included videos embedded in and linked within The Athletic articles.

88.     He never consented to his PII or video viewing information being shared with Third Parties.

**B.      Experience Of Plaintiff Max Theriault**

89.      In or about 2020, Plaintiff Theriault created an account with the NYT.  In order to set up a subscription he provided his full name, email address, and payment information, including his billing address.  He is still a subscriber.

90.      Since he began his subscription until the present day, Plaintiff Theriault has watched pre-recorded videos about his favorite sports teams, including several videos on the topic of Tom Brady's retirement from the NFL.  These videos have included both embedded videos as well as videos produced by The Athletic.

91.      He watches these pre-recorded videos primarily on his iPhone 13 Pro, which he still owns, and less frequently on a Chrome browser.

92.       Plaintiff Theriault has been the victim of multiple data breaches and is disturbed that The Athletic, a trusted publication, would share his information in an unauthorized manner.  He never consented to his PII or video viewing information being shared with Third Parties.

**C.      Experience Of Plaintiff Esteban Cuesta**

93.      In or about October 2021, through a one-year free trial from T-Mobile, Plaintiff Cuesta created a standalone account with The Athletic.  To set up his subscription, he provided his full name, email address, and payment information, including his billing address.  In October 2022, when the trial ended, he began paying for the service himself.

94.      In or about December 2022, Plaintiff Cuesta deleted his The Athletic account.

95.      While he was a paid subscriber, Plaintiff Cuesta watched pre-recorded videos about his favorite sports teams through The Athletic App for iOS on his iPhone 10 (the use of which he discontinued in May 2023 and is no longer in his possession).  These included embedded videos

as well as videos produced by The Athletic, such as the video entitled "Lionel Messi's Strange Relationship with Saudi Arabia."[46]

96.     He never consented to his PII or video viewing information being shared with Third Parties.

## CLASS ALLEGATIONS

97.     Plaintiffs bring this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and/or (c)(4) as representatives of the following class:

> Plaintiffs seek to represent a class of similarly situated individuals defined as all persons who used The Athletic streaming service to watch videos and had their PII transmitted to a third party (the "Class").

98.     Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

99.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiffs do not know the exact number of members of the aforementioned Class.  However, given the existing and growing popularity of The Athletic, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

100.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

---

[46] Currently available at: *Tifo Football*, YOUTUBE (Dec. 21, 2022) https://www.youtube.com/watch?v=FDLqyRcm2yM (explaining in the caption that Tifo Football was "[f]ounded in 2017 and became a part of The Athletic in 2020"); *see also Tifo Football*, THE ATHLETIC, https://www.nytimes.com/athletic/author/tifo-football/ (last visited Aug. 22, 2024).

(a)     whether Defendants collected Plaintiffs' and the Class' PII;

(b)     whether Defendants unlawfully disclosed and continue to disclose subscribers' PII, including their video viewing records, in violation of the VPPA and VCPA;

(c)     whether Defendants' disclosures were committed knowingly; and

(d)     whether Defendants disclosed Plaintiffs' and the Class' PII without consent.

101.    **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, watched pre-recorded videos on The Athletic and had their PII collected and disclosed by Defendants to the Third Parties.

102.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring.  Plaintiffs and their counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiffs have raised viable statutory claims, or the type reasonably expected to be raised by members of the Class and will vigorously pursue those claims.  If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

103.    **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable.  Even if every member of the Class could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized

litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class.  Plaintiffs anticipate no difficulty in the management of this action as a class action.

## NEW YORK LAW APPLIES TO THE CLASS

104.    New York's substantive laws apply to every member of the Class, regardless of where in the United States the Class Member resides.

105.    New York's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, U.S. Const. amend. XIV § 1, and the Full Faith and Credit Clause, U.S. Const. art. IV § 1. New York has significant contacts, or a significant aggregation of contacts, to the claims asserted by Plaintiff and all Class members, thereby creating state interest that ensures that the choice of New York state law is not arbitrary or unfair.

106.    Defendants' headquarters and principal places of business are located in New York. Defendants also own property and conduct substantial business in New York, and therefore New York has an interest in regulating Defendants' conduct under its laws.  Defendants' decision to reside in New York and avail themselves of New York's laws, and to engage in the challenged conduct from and emanating out of New York, renders the application of New York law to the claims herein constitutionally permissible.  New York is also the state from which Defendants' alleged misconduct emanated.  This conduct similarly injured and affected Plaintiffs and all other Class members.

107.    The application of New York laws to the Class is also appropriate under New York's choice of law rules because New York has significant contacts to the claims of Plaintiffs and the proposed Class, and New York has a greater interest in applying its laws here than any other interested state.

## CAUSES OF ACTION

### COUNT I
**Violation of the VIDEO PRIVACY PROTECTION ACT (VPPA)**
**18 U.S.C. § 2710**
**Against The Athletic and the NYT**

108.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

109.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.

110.    Defendants The Athletic and the NYT are "video tape service provider(s)" as defined by the VPPA because they "engage[] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as they provide video (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via its website.

111.    Plaintiffs and members of the Class are "consumer(s)" as defined by the VPPA because they watched pre-recorded videos on The Athletic's website.  18 U.S.C. § 2710(a)(1). Under the VPPA, therefore, Plaintiffs and Class Members are "subscriber[s] of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1); *see also Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 485, 487-89 (1st Cir. 2016).

112.    Plaintiffs and Class Members viewed pre-recorded videos on The Athletic's website.  During these occasions, the website disclosed the PII of Plaintiffs and members of the Class in varying combinations to the Third Parties.  Specifically, the website disclosed Plaintiffs'

and Class Members': (i) e-mail addresses, (ii) names, (iii) unique customer IDs, (iv) video titles of viewed videos, (v) video descriptions, and (vi) video interactions showing a user actually viewed a video.

113.   The website's transmissions of Plaintiffs' and Class Members' PII to the Third Parties constitute "knowing[] disclos[ures]" of Plaintiffs' and Class Members' "personally identifiable information" to a person as proscribed by the VPPA.  18 U.S.C. § 2710(b)(1).

114.   Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  The information disclosed by The Athletic and the NYT constitutes "personally identifiable information" because it allows an ordinary to identify Plaintiffs and members of the Class, as well as which specific videos were watched by each Plaintiff and each member of the Class.  The disclosures also make it reasonably and foreseeably likely to reveal which specific videos were viewed by each Plaintiff and each member of the Class.

115.   Plaintiffs and members of the Class did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

116.   Nor were The Athletic's and the NYT's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  18 U.S.C. § 2710(a)(2).  In particular, The Athletic's, and by extension the NYT's, disclosures to the Third Parties were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  *Id.*

117.   On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII;

(iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c)(2)(A); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

**COUNT II**
**Violation of the NEW YORK VIDEO CONSUMER PROTECTION ACT (VCPA)**
**N.Y. General Business Law §§ 670-675**
**Against The Athletic and the NYT**

118.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

119.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.

120.    Defendants The Athletic and the NYT are "video tape service provider(s)" as defined by the VCPA because they "engaged in the business of rental of prerecorded video cassette tapes or similar audio visual materials," N.Y. Gen. Bus. Law § 672(4), inasmuch as they provide video (*i.e.*, "similar audio visual materials" under the VCPA's definition) to consumers via its website.

121.    Plaintiffs and members of the Class are "consumer(s)" as defined by the VCPA because they had paid subscriptions to the NYT and/or The Athletic and watched videos on The Athletic's website.  N.Y. Gen. Bus. Law § 672(1).  Under the VCPA, therefore, Plaintiffs and Class Members are or were "subscribers" of "goods or services from a video tape service provider." *Id.*

122.    Plaintiffs and Class Members viewed videos on The Athletic's website.  During these occasions, the website disclosed the PII of Plaintiffs and members of the Class in varying combinations to the Third Parties.  Specifically, the website disclosed Plaintiffs' and Class Members': (i) e-mail addresses, (ii) names, (iii) unique customer IDs, (iv) video titles of viewed videos, (v) video descriptions, and (vi) video interactions showing a user actually viewed a video.

123.    The website's transmissions of Plaintiffs' and Class Members' PII to the Third Parties constitute "knowing[] disclos[ures]" of Plaintiffs' and Class Members' "personally identifiable information" to a person as proscribed by the VCPA.  N.Y. Gen. Bus. Law § 674(1).

124.    Under the VCPA, the term "'personally identifiable information' means any information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider or video tape seller."  N.Y. Gen. Bus. Law § 672(3). The information disclosed by The Athletic and the NYT constitutes "personally identifiable information" because it allows an ordinary person to identify Plaintiffs and members of the Class, as well as which specific videos were watched by each Plaintiff and each member of the Class.

125.    Plaintiffs and members of the Class did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.  *See* N.Y. Gen. Bus. Law § 672(6).

126.    Nor were The Athletic's and the NYT's disclosures made in the "ordinary course of business" as the term is defined by the VCPA.  N.Y. Gen. Bus. Law § 673(3)(c). On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with VCPA's requirements for protecting a consumer's PII; (iii) statutory damages of $500 for each violation of the VCPA pursuant to N.Y. Gen. Bus. Law § 675(1); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek a judgment against Defendants, individually and on behalf of all others similarly situated, as follows:

(a)    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendants' conduct violates the VPPA;

(c)     For an order declaring that Defendants' conduct violates the VCPA;

(d)     For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(e)     An award of statutory damages to the extent available;

(f)     For punitive damages, as warranted, in an amount to be determined at trial;

(g)     For prejudgment interest on all amounts awarded;

(h)     For injunctive relief as pleaded or as the Court may deem proper; and

(i)     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiffs demand a trial by jury of all issues so triable.

Dated: September 9, 2024            Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

By: */s/ Guillaume Buell*
Guillaume Buell (Bar No.: 676566)
Michael P. Canty (*pro hac vice forthcoming*)
Carol C. Villegas (*pro hac vice forthcoming*)
Danielle Izzo (*pro hac vice forthcoming*)
Gloria J. Medina (*pro hac vice forthcoming*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: gbuell@labaton.com
       mcanty@labaton.com
       cvillegas@labaton.com
       dizzo@labaton.com
       gmedina@labaton.com

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (*pro hac vice forthcoming*)
Max S. Roberts (*pro hac vice forthcoming*)
Victoria X. Zhou (*pro hac vice forthcoming*)
1330 Avenue of the Americas, Floor 32
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
         mroberts@bursor.com
         vzhou@bursor.com


*Attorneys for Plaintiffs and the Proposed Class*