**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

DAVIN COPPEDGE, MAX THERIAULT, and ESTEBAN CUESTA individually and as a representative of all others similarly situated,

Plaintiffs,

vs.

THE ATHLETIC MEDIA COMPANY and THE NEW YORK TIMES COMPANY,

Defendants.

Case No. 1:24-cv-12312-JEK

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL ARBITRATION**

Tony K. Lu (BBO# 678791)
DENTONS US LLP
101 Federal Street
Suite 1900
Boston, Massachusetts 02110
Telephone: (617) 235-6817
Facsimile: (617) 235-6899
Email: tony.lu@dentons.com

Kristen C. Rodriguez (*pro hac vice*)
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: kristen.rodriguez@dentons.com

*Counsel for Defendants The Athletic Media Company and The New York Times Company*

## TABLE OF CONTENTS


I. FACTUAL BACKGROUND .......... 1

A. Overview of The Athletic and Plaintiffs' Claims .......... 1

B. Plaintiffs Affirmatively Consented to Arbitration, Some Multiple Times. .......... 2

1. Plaintiffs Coppedge And Cuesta Accepted The Then-Applicable Terms Of Service By Creating Accounts With The Athletic. .......... 2

2. Coppedge And Theriault Agreed To The 2021 Terms When They Accessed The Athletic With Their New York Times Accounts. .......... 3

3. All Plaintiffs Received Notice Of The 2024 Terms. .......... 4

4. Coppedge And Theriault Agreed To The 2024 Terms Via The 2024 Overlay. .......... 4

C. Each Plaintiff Agreed to Arbitrate Their Claims on an Individual Basis. .......... 5

1. The February 2017 Terms .......... 5

2. The July 2019 Terms .......... 6

3. The September 2021 Terms .......... 6

4. The January 2024 Terms .......... 7

II. LEGAL STANDARD .......... 7

III. ARGUMENT .......... 8

A. A Valid Arbitration Agreement Exists. .......... 8

1. Massachusetts And New York Law On Online Consumer Agreements. .......... 9

2. Plaintiffs Entered Into Sign-In-Wrap Agreements By Creating Accounts And/Or Signing In With New York Times Credentials. .......... 10

3. Two Plaintiffs Entered Into Clickwrap Agreements To The 2024 Terms By Clicking On The 2024 Overlay. .......... 11

B. Any Questions Of Arbitrability Must Be Decided By An Arbitrator. .......... 12

C. Though Not For The Court To Decide, The Arbitration Clauses Are Valid And Enforceable. .......... 14

1. The Arbitration Clauses Are Not Procedurally Unconscionable. .......... 15

2. The Arbitration Clauses Are Not Substantively Unconscionable. .......... 17

D. Though Not For The Court To Decide, The Agreement To Arbitrate Encompasses Plaintiffs' Claims. .......... 18

E. Though Not An Issue For The Court, Arbitration May Not Proceed On A Class-Wide Basis. .......... 19

F. The Court Should Stay And Administratively Close This Action. .......... 20

IV. CONCLUSION .......... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfia v. Coinbase Glob., Inc.*,
2022 WL 3205036 (N.D. Cal. July 22, 2022)....................19

*Apollo Computer, Inc. v. Berg*,
886 F.2d 469 (1st Cir. 1989)....................14

*AsymmetRx, Inc. v. Dako Denmark A/S*,
626 F. Supp. 2d 182 (D. Mass. 2009)....................20

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)....................7

*AT&T Techs., Inc. v. CWA*,
475 U.S. 643 (1986)....................18

*Bekele v. Lyft, Inc.*,
199 F. Supp. 3d 284 (D. Mass. 2016), *aff'd*, 918 F.3d 181 (1st Cir. 2019)................15, 16, 18

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015)....................10

*Bosse v. N.Y. Life Ins. Co.*,
992 F.3d 20 (1st Cir. 2021)....................8, 14

*Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*,
2011 WL 744732 (S.D.N.Y. Mar. 1, 2011)....................9

*Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*,
58 F.3d 16 (2d Cir. 1995)....................19

*Crewe v. Rich Dad Educ., LLC*,
884 F. Supp. 2d 60 (S.D.N.Y. 2012)....................13

*Cullinane v. Uber Techs., Inc.*,
893 F.3d 53 (1st Cir. 2018)....................8, 9, 10, 11

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985)....................8

*Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*,
638 F.3d 367 (1st Cir. 2011)....................18

*Emmannuel v. Handy Techs., Inc.*,
442 F. Supp. 3d 385 (D. Mass. 2020), *aff'd sub nom. Emmannuel v. Handy Techs., Inc.*, 992 F.3d 1 (1st Cir. 2021) ....................17

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018)....................19

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995)....................11

*Fteja v. Facebook, Inc.*,
841 F. Supp. 2d 829 (S.D.N.Y. 2012)....................11

*Grand Wireless, Inc. v. Verizon Wireless, Inc.*,
748 F.3d 1 (1st Cir. 2014)....................19

*Haft v. Haier US Appliance Sols., Inc.*,
578 F. Supp. 3d 436 (S.D.N.Y. 2022)....................15

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
139 S. Ct. 524 (2019)....................8, 12, 13

*Hu v. Whaleco, Inc.*,
2024 WL 4481439 (E.D.N.Y. Oct. 1, 2024)....................9

*In re Intuniv Antitrust Litig.*,
2021 WL 517386 (D. Mass. Feb. 11, 2021) ....................14

*Johnson v. Oracle Am., Inc.*,
764 F. App'x 607 (9th Cir. 2019) ....................14

*Kaplan v. Athletic Media Co.*,
705 F. Supp. 3d 992 (N.D. Cal. 2023) ....................11

*Katsoris v. WME IMG, LLC*,
237 F. Supp. 3d 92 (S.D.N.Y. 2017)....................14

*Lamps Plus, Inc. v. Varela*,
139 S. Ct. 1407 (2019)....................19

*Lawrence v. NYC Med. Prac., P.C.*,
2023 WL 4706126 (S.D.N.Y. July 21, 2023) ....................16

*Machado v. System4 LLC*,
28 N.E.3d 401 (2015)....................15

*Martinez v. GAB.K, LLC*,
2024 WL 3460983 (S.D.N.Y. July 18, 2024) ....................18

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)....10

*Mumin v. Uber Techs., Inc.*,
239 F. Supp. 3d 507 (E.D.N.Y. 2017)....17

*Nayal v. HIP Network Servs. IPA, Inc.*,
620 F. Supp. 2d 566 (S.D.N.Y. 2009)....17

*Neighborly Cap. Co. v. Schumacher Ctr. for a New Econ.*,
2024 WL 1178458 (D. Mass. Mar. 19, 2024)....14

*Perez-Tejada v. Mattress Firm, Inc.*,
No. CV 17-12448-DJC, 2019 WL 830450 (D. Mass. Feb. 21, 2019)....17

*Rent-A-Ctr., W., Inc. v. Jackson*,
561 U.S. 63 (2010)....18

*Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.*,
43 F.4th 150 (1st Cir. 2022)....2

*Sea Tow Servs. Int'l, Inc. v. Tampa Bay Marine Recovery, Inc.*,
632 F. Supp. 3d 91 (E.D.N.Y. 2022)....15

*Soto v. State Indus. Prods., Inc.*,
642 F.3d 67 (1st Cir. 2011)....8

*Sultan v. Coinbase, Inc.*,
354 F. Supp. 3d 156 (E.D.N.Y. 2019)....9

*Tannatt v. Varonis Sys., Inc.*,
2019 WL 830482 (D. Mass. Feb. 21, 2019)....14

*Teta v. Go N.Y. Tours, Inc.*,
2024 WL 3252907 (S.D.N.Y. July 1, 2024)....12

*Toth v. Everly Well, Inc.*,
2024 WL 4284672 (1st Cir. Sept. 25, 2024)....12

*Vaiano v. United Nat'l Corp.*,
2024 WL 2134389 (D. Mass. May 13, 2024)....9, 17

*Wickberg v. Lyft, Inc.*,
356 F. Supp. 3d 179 (D. Mass. 2018)....9, 12

**Statutes**

Federal Arbitration Act ("FAA") 9 U.S.C. §§ 1-16.... *passim*

**Other Authorities**

Federal Rule of Civil Procedure 8(b)....................13

Federal Rule of Civil Procedure 11(b)....................13

Federal Rule of Civil Procedure 12(b)(6)....................2

Federal Rule of Civil Procedure 12(h)(2)....................2

This dispute does not belong in court. On multiple occasions, each of the three Plaintiffs agreed to The Athletic's Terms of Service, which, at all relevant times, contained a valid and binding arbitration provision and class action waiver. Ignoring that they agreed to arbitrate, Plaintiffs filed this putative class action, alleging violations of the federal Video Privacy Protection Act and its New York state law analog.

Because Plaintiffs affirmatively agreed to arbitrate their claims, and the applicable arbitration agreements clearly and unmistakably delegated issues of arbitrability to the arbitrator, this Court's role is limited to determining whether a valid arbitration agreement exists. Thus, to the extent Plaintiffs contend their claims are not subject to the arbitration agreement, even that issue must be decided in arbitration.

Defendants respectfully request that the Court grant this Motion and compel Plaintiffs to arbitrate their claims in accordance with the clear and binding arbitration agreements to which they assented, and administratively close this matter while the arbitration is pending.

# I. FACTUAL BACKGROUND

## A. Overview of The Athletic and Plaintiffs' Claims

The Athletic is a subscription-based online sports news outlet. (Declaration of Corey Floyd (the "Floyd Dec.") ¶ 4.) The Plaintiffs here allege that they visited The Athletic's website and watched videos. (Compl. ¶¶ 87, 90, 95.) They claim The Athletic transmitted their video viewing history and personally identifiable information to third parties without their consent via programming embedded in The Athletic's website and mobile app. (Compl. ¶¶ 34–41.)[1]

---

[1] Plaintiffs' claims are meritless, but this Court need not (and should not) undertake that analysis, and Defendants reserve the right to file a Rule 12(b)(6) motion at a later time. *See* FRCP Rule 12(h)(2); *see also Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 172 (1st Cir. 2022) (analysis of the merits via a 12(b)(6) motion is "premature" given the pending question of arbitration).

### B. Plaintiffs Affirmatively Consented to Arbitration, Some Multiple Times.

The Athletic's records reflect that all three Plaintiffs were presented with, and affirmatively assented to, Terms of Service (the "Terms") when they created their accounts with The Athletic and subscribed (some doing so multiple times), and that some of the Plaintiffs later consented to the Terms again in response to a popup screen/overlay pushed to users. As explained below, all versions of the Terms of Service contained mandatory arbitration clauses and class action waivers. The below chart summarizes the versions of the Terms to which Plaintiffs assented and how:

| **Plaintiff** | **Feb 2017 Terms** (account creation) | **July 2019 Terms** (account creation) | **Sept. 2021 Terms** (account creation or NYT sign in) | **Jan. 2024 Terms** (2024 Overlay) |
| --- | --- | --- | --- | --- |
| **Coppedge** | ✓ | | ✓ | ✓ |
| **Theriault** | | | ✓ | ✓ |
| **Cuesta** | ✓ | ✓ | | |

#### *1. Plaintiffs Coppedge And Cuesta Accepted The Then-Applicable Terms Of Service By Creating Accounts With The Athletic.*

Plaintiffs Coppedge and Cuesta assented to The Athletic's then-operative Terms by creating accounts with The Athletic. (Floyd Dec. ¶¶ 13-20; 46-53.) Both Coppedge and Cuesta created multiple accounts with The Athletic at various points in time using different email addresses, each time agreeing to the Terms then-in effect. (*Id.*) For example, in September 2018, while creating his first account, Coppedge had to click on a "Create Account" button, agreeing to a short and simple statement located just below that button that stated "By registering, you agree with The Athletic's Terms of Service and Privacy Policy." (*Id.* ¶¶ 16-17.) The words "Terms of Service" were hyperlinked; clicking "Terms of Service" would open the

February 2017 Terms. (*Id.* ¶ 18.)[2] Likewise, Cuesta, upon creating an account in September 2020, was presented with the following statement just below the option to "Sign up with Email": "By creating an account above, you agree to The Athletic's Terms of Service and Privacy Policy." (*Id.* ¶ 53.) The words "Terms of Service" were underlined and hyperlinked to the July 2019 Terms. (*Id.*)[3]

The statements on the screens presented to Coppedge and Cuesta were visible without scrolling, and appeared on a clean, uncluttered screen, in close proximity to the requisite buttons a user had to click to proceed. (*See* Corey Dec. Exs. 4, 6, 14, 15, 17.) Moreover, all of the hyperlinks were linked to the directly to the applicable Terms. (*Id.* ¶¶ 18, 20, 49, 52, 53.) Based on the dates they created their accounts, Coppedge agreed to the February 2017 Terms and the 2021 Terms, and Cuesta agreed to the February 2017 and July 2019 Terms. (*Id.*)

***2. Coppedge And Theriault Agreed To The 2021 Terms When They Accessed The Athletic With Their New York Times Accounts.***

The New York Times has owned The Athletic since 2022. (*Id.* ¶ 5.) Beginning in September 2022, The New York Times account holders could log in to The Athletic using their New York Times credentials. (*Id.* ¶ 22.) The Athletic redirected users on their website to a custom landing page titled "Continue to The Athletic using your New York Time account". (*Id.*)

[2] A few years later, Coppedge created another account with The Athletic in August 2021 and was presented with a similar screen, thereby agreeing to the 2021 Terms that were in place at the time. (*Id.* at ¶¶ 19-21.)

[3] This was the second time Cuesta agreed to the July 2019 Terms. Just a little over a month earlier, Cuesta created another account with The Athletic, agreeing to the July 2019 Terms through a similar screen that stated, "By creating an account above, you agree to The Athletic's Terms of Service and Privacy Policy." (*Id.* ¶¶ 51-52.) And even before then, Cuesta had signed up for another account with The Athletic via mobile device in November 2018, where he agreed to the following statement: "By signing up, I agree to The Athletic **terms of service** and **privacy policy**." The statement appeared, without scrolling, below "SIGN UP" buttons on the screen, one of which he had to click to create his account. The words "**terms of service**" were bolded and hyperlinked to the February 2017 Terms. (*Id.* ¶¶ 48-49.)

The page specifying that the user understood that by continuing, the "email address and account would be shared with The Athletic and [the user] … agree[d] to [The Athletic's] Terms of Service and Privacy Policy." (*Id.* ¶¶ 22-23.) This statement was visible on the screen without scrolling and users had to click on one of the "Continue" buttons to use The Athletic with their Times credentials. The words "Terms of Service and Privacy Policy" in the sentence were hyperlinked to the September 2021 Terms. (*Id.* ¶¶ 23, 25, 39.) The Athletic's records reflect that both Coppedge and Theriault accessed this landing page and clicked on one of the "Continue" buttons on the landing page in May 2023. (*Id.* ¶¶ 25, 38.)

#### ***3. All Plaintiffs Received Notice Of The 2024 Terms.***

On December 31, 2023, The Athletic informed users of a forthcoming update to the Terms of Service via e-mail, which linked to the January 15, 2024 Terms of Service (the "January 2024 Terms"). The subject line was "We have updated our U.S. Terms of Service." (*Id.* ¶¶ 26, 27.) The Dec. 2023 Email was delivered to all of the email addresses associated with Plaintiffs' accounts. (*Id.* ¶¶ 28, 40, 54.)

#### ***4. Coppedge And Theriault Agreed To The 2024 Terms Via The 2024 Overlay.***

As of December 15, 2023, The Athletic began presenting users with an overlay on its content (the "2024 Overlay"). (*Id.* ¶ 30.) The 2024 Overlay appeared on top of the content. (*Id.*) Under the large bold header titled "Updated Terms," readers were informed as follows: "We have made some changes to our Terms of Service including how we will resolve disputes between us. These terms will apply to U.S. residents only. By clicking the button below, you

acknowledge and accept our updated terms. To review the full terms, **click here**." (*Id.* ¶ 31.)




The bolded words "click here" were hyperlinked to the January 2024 Terms of Service (the "January 2024 Terms") and appeared just above the large red button labeled "I Accept." (*Id.* ¶¶ 30-31.) A user could not access any of The Athletic's content without first clicking "I Accept." (*Id.* ¶ 30.) The Athletic's records confirm the exact day and time on which Coppedge and Theriault clicked the "I Accept" button on the 2024 Overlay. Coppedge clicked "I Accept" on January 10, 2024 at 6:14 p.m. Coordinated Universal Time (UTC). (*Id.* ¶¶ 33-35.) Theriault clicked "I Accept" button on January 10, 2024 at 11:57 a.m. UTC. (*Id.* ¶¶ 42-44.)

**C. Each Plaintiff Agreed to Arbitrate Their Claims on an Individual Basis.**

Each of the relevant Terms to which the Plaintiffs affirmatively agreed contained a class action waiver and arbitration agreement.

***1. The February 2017 Terms***

The February 2017 Terms (Floyd Dec. Ex. 5), to which Coppedge and Cuesta agreed, contained the following language in all capital letters in its introduction:

> THIS AGREEMENT CONTAINS A MANDATORY ARBITRATION OF DISPUTES PROVISION THAT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS.

The February 2017 Terms also contained an arbitration agreement and class action waiver that provided as follows:

> ALL CLAIMS MUST BE BROUGHT IN THE PARTIES' INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION, COLLECTIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION OR OTHER REPRESENTATIVE PROCEEDING. THIS WAIVER APPLIES TO CLASS ARBITRATION, AND, UNLESS WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS. YOU AGREE THAT, BY ENTERING INTO THIS TERMS OF SERVICE, YOU AND COMPANY ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION, .COLLECTIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, OR OTHER REPRESENTATIVE PROCEEDING OF ANY KIND.

***2. The July 2019 Terms***

The July 2019 Terms (Floyd Dec. Ex. 16), to which Cuesta agreed twice, contain the following provisions: "Any dispute arising from or relating to the subject matter of these Terms shall be finally settled in San Francisco County, California, in English, in accordance with the Streamlined Arbitration Rules and Procedures of Judicial Arbitration and Mediation Services, Inc. ("JAMS") . . . ." The July 2019 Terms also provided that "Any arbitration under these Terms will take place on an individual basis: class arbitrations and class actions are not permitted." Finally, the July 2019 Terms featured capitalized language stating:

> YOU UNDERSTAND AND AGREE THAT BY ENTERING INTO THESE TERMS, YOU AND THE ATHLETIC ARE EACH WAIVING THE RIGHT TO TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION.

***3. The September 2021 Terms***

The September 2021 Terms (Floyd Dec. Ex. 7), to which Coppedge and Theriault agreed, also contain mandatory arbitration and class action waiver provisions. For example,

> (d) Waiver of Jury Trial. YOU AND THE ATHLETIC WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO GO TO COURT AND HAVE A TRIAL IN FRONT OF A JUDGE OR JURY. You and The Athletic are instead choosing to have claims and disputes resolved by arbitration. Arbitration procedures are typically more limited, more efficient, and less costly than rules applicable in court and are subject to very limited review by a court. In any litigation between you and The Athletic over whether to vacate or enforce an arbitration award, YOU AND THE ATHLETIC WAIVE ALL RIGHTS TO A JURY TRIAL, and elect instead to have the dispute be resolved by a judge.

> (e) Waiver of Class or Consolidated Actions. ALL CLAIMS AND DISPUTES WITHIN THE SCOPE OF THIS ARBITRATION AGREEMENT MUST BE ARBITRATED OR LITIGATED ON AN INDIVIDUAL BASIS AND NOT ON A CLASS BASIS. CLAIMS OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR LITIGATED JOINTLY OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER.

#### ***4. The January 2024 Terms***

Finally, the January 2024 Terms (Floyd Dec. Ex. 10), to which Coppedge and Theriault agreed to through the 2024 Overlay, include language that signals the importance of the arbitration agreement and the class action waiver. The class action waiver itself opens with the following in caps and bold:

> **PLEASE READ THIS SECTION CAREFULLY. IT AFFECTS YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT TO FILE OR PARTICIPATE IN A LAWSUIT IN COURT.**

and after the heading "Class Action Waiver" (in bold), the Terms, in caps, state:

> YOU AND THE ATHLETIC AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER IN ARBITRATION OR LITIGATION ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER . . .

(Floyd Dec. ¶ 64, Ex. 10.) The January 2024 Terms also contain an arbitration agreement that makes clear that "the parties shall be bound by arbitration governed by the AAA Consumer Arbitration Rules."

## II. <u>LEGAL STANDARD</u>

The Federal Arbitration Act ("FAA"), which governs arbitration agreements in interstate commerce such as the agreements here, provides that arbitration clauses "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has emphasized that Section 2 "reflect[s] both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citation omitted). The FAA "leaves no place for the exercise of discretion by a

district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. §§ 3, 4).

"Under the Federal Arbitration Act, parties to a contract may agree that an arbitrator rather than a court will resolve disputes arising out of the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019). "A party seeking to compel arbitration under the FAA must demonstrate that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." *Soto v. State Indus. Prods., Inc.*, 642 F.3d 67, 72 (1st Cir. 2011) (internal quotation omitted). Defendants easily meet this standard.

## III. ARGUMENT

Plaintiffs affirmatively agreed to arbitrate their claims multiple times, entering into binding contracts under the applicable laws of their respective home states. The arbitration agreements clearly and unmistakably delegated issues of arbitrability to the arbitrator, and thus, the court's "proper inquiry" before compelling arbitration is limited to whether a valid arbitration agreement exists and whether arbitrability is delegated to the arbitrator. *Bosse v. N.Y. Life Ins. Co.*, 992 F.3d 20, 28 (1st Cir. 2021).

### A. A Valid Arbitration Agreement Exists.

A valid agreement to arbitrate exists here because, under established law governing contract formation, Plaintiffs affirmatively agreed to The Athletic's Terms, which include an arbitration clause and class action waiver. *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 61 (1st Cir. 2018) ("'When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts. . . should apply ordinary state-law principles that govern the formation of contracts.'") (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

***1. Massachusetts And New York Law On Online Consumer Agreements.***

Plaintiffs allege they are New York and Massachusetts residents. (Compl. ¶¶ 11-13.) Under both states' laws, parties must manifest their mutual assent to the terms of an agreement in order to form a contract. *See Sultan v. Coinbase, Inc.*, 354 F. Supp. 3d 156, 159 (E.D.N.Y. 2019); *Vaiano v. United Nat'l Corp.*, 2024 WL 2134389, at *4 n.3 (D. Mass. May 13, 2024). In New York, even if an internet user lacks actual knowledge of contractual terms, "the user will still be bound if (1) a reasonably prudent person would be on *inquiry* notice of the terms, and (2) the user unambiguously manifests assent through … conduct that a reasonable person would understand to constitute assent." *Hu v. Whaleco, Inc.*, 2024 WL 4481439, at *10 (E.D.N.Y. Oct. 1, 2024) (internal citation and quotation marks omitted). Massachusetts applies a similar two-step inquiry, considering whether: (1) the terms reasonably communicated to Plaintiff; and (2) whether the customer affirmatively accept the terms, and if so, the manner of the acceptance. *Cullinane,* 893 F.3d at 61-62 (internal citations omitted).

Courts in both states routinely find "clickwrap" agreements—in which consumers must affirmatively indicate they agree to specified contractual terms to proceed—to be enforceable. *See Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011) ("In New York, clickwrap agreements are valid and enforceable contracts.") (citing cases); *Wickberg v. Lyft, Inc.*, 356 F. Supp. 3d 179, 183 (D. Mass. 2018) (clickwrap agreements "are generally held enforceable"). Additionally, "sign-in-wrap" agreements—where a consumer is notified of the existence of the terms while proceeding through a login or sign-up process—are found enforceable where, as is true here, the link to the terms is conspicuous such that consumers have notice of and a reasonable opportunity to access the terms. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 400 (E.D.N.Y. 2015); *Cullinane,* 893 F.3d at 62. The Plaintiffs here agreed to the Terms through sign-in-wrap or clickwrap agreements, or both, which are clearly enforceable.

### *2. Plaintiffs Entered Into Sign-In-Wrap Agreements By Creating Accounts And/Or Signing In With New York Times Credentials.*

Plaintiffs Coppedge and Cuesta affirmatively agreed to the Terms when they entered into sign-in-wrap agreements by creating accounts with The Athletic. In order to create an account, each Plaintiff was required to click a button located directly above an agreement statement, which specified that creating an account would demonstrate consent to the Terms. (Floyd Dec. Exs. 4, 6, 14, 15, 17) The agreement statements (such as "By registering, you agree with The Athletic's Terms of Service and Privacy Policy" or "By creating an account [above], you agree to The Athletic's <u>Terms of Service</u> and <u>Privacy Policy</u>") were each a short, simple sentence, not buried in other text. They were located on a clean, uncluttered page without significant text distracting from them, in reasonable proximity to the button the users had to click to proceed. (*Id.*) The text "Terms of Service" was hyperlinked to the relevant Terms. (*Id.*)

In addition, Coppedge and Theriault each agreed to the Terms by clicking on a link allowing them to log on to The Athletic using their New York Times account information. The custom landing page that subscribers to the Times saw included a statement clearly indicating that by clicking the "continue" button, a user agreed to The Athletic's Terms of Service and Privacy Policy. (*Id.* ¶¶ 22-23.) This statement was visible on the screen without having to scroll, and the words "Terms of Service" were underlined and hyperlinked to the Terms in place then.

These presentations were sufficient to bind each Plaintiff to each set of the Terms in place at the time of the agreement. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (enforcing sign-in-wrap agreement where "uncluttered" screen included an agreement statement linking to terms below the registration button); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) (finding plaintiff assented to sign-in-wrap agreement where he clicked "Sign Up" button located above the statement, "By clicking Sign Up, you are indicating

that you have read and agree to the Terms of Service"); *Cullinane*, 893 F.3d at 62 (noting that courts must consider facts such as "the language that was used to notify users that the terms of their arrangement with [the service provider] could be found by following the link, how prominently displayed the link was, and any other information that would bear on the reasonableness of communicating [the terms]."

***3. Two Plaintiffs Entered Into Clickwrap Agreements To The 2024 Terms By Clicking On The 2024 Overlay.***

The sign-in-wrap agreements alone were sufficient to bind Plaintiffs to the Terms, but two Plaintiffs—Coppedge and Theriault—also entered into clickwrap agreements to the 2024 Terms. (Floyd Dec. ¶¶ 31-35, 41-45.) Their affirmative acceptance of the 2024 Terms followed The Athletic's email campaign in late 2023 of the upcoming change in Terms, of which all Plaintiffs received notice. (*Id.* at ¶¶ 26-28, 40, 54.)

Notably, the Northern District of California, in analyzing a substantively identical, earlier version of The Athletic's overlay under California law, granted The Athletic's Motion to Compel in that matter because that overlay was "reasonably conspicuous."[4] *Kaplan v. Athletic Media Co.*, 705 F. Supp. 3d 992, 1002 (N.D. Cal. 2023) (attached as Ex. 1). The court there noted that the 2021 overlay was "sufficiently large, all of the language in the overlay pertains to agreement to the Terms of Service and Privacy Policy, and the overlay features a hyperlink in bolded text. The font and format of the overlay are such that any reasonably prudent user necessarily would have seen it." *Id.* Likewise, the 2024 Overlay informed users in clear text that "By clicking the

[4] California's online contract formation law is substantively similar to Massachusetts and New York. *E.g. Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 514 (9th Cir. 2023) (reasonably conspicuous notice and unambiguous manifestation of assent required).

button below, you acknowledge and consent to our updated terms. To review the full terms, click here." Those Terms were hyperlinked in the 2024 Overlay in the bolded text "**click here**." To continue on to The Athletic's website, the user had to click on the "I Accept" button just below the bolded text. (Floyd Dec. Ex. 12.) The Athletic's records show that Coppedge and Theriault both clicked on the "I Accept" button on January 10, 2024. (Floyd Dec. ¶¶ 33, 42.)

Under settled law, by affirmatively clicking on the "I Accept" button in the 2024 Overlay, Plaintiffs Coppedge and Theriault entered into a clickwrap agreement—a form courts routinely find enforceable—and accepted the relevant Terms. *See, e.g.*, *Toth v. Everly Well, Inc.*, 2024 WL 4284672, at *5 (1st Cir. Sept. 25, 2024) (finding a clickwrap contract where consumers had to click "I agree" in order to proceed was "a validly formed contract under Massachusetts law"); *Wickberg*, 356 F. Supp. 3d at 184 (finding plaintiff "entered into a valid arbitration agreement . . . by affirmatively assenting to reasonably communicated terms" by clicking "I agree"); *Teta v. Go N.Y. Tours, Inc.*, 2024 WL 3252907, at *3–4 (S.D.N.Y. July 1, 2024) ("[T]he parties are bound by the arbitration provisions of the terms and conditions [where] [p]laintiffs were required to click on a box indicating agreement to certain terms and conditions before purchasing their tickets."). In short, all Plaintiffs variously agreed to the Terms either when they created their accounts with The Athletic, and two Plaintiffs additionally did so when they clicked "I Accept" in the 2024 Overlay. The Plaintiffs are therefore bound by the mandatory arbitration provisions contained in the Terms and they must proceed in that forum.

### B. Any Questions Of Arbitrability Must Be Decided By An Arbitrator.

The parties have agreed in this case that questions about the scope of the agreement are delegated to the arbitrator. (Floyd Dec. Exs. 5, 7, 10, 16.) "Under the Federal Arbitration Act, parties to a contract may agree that an arbitrator rather than a court will resolve disputes arising out of the contract." *Henry Schein*, 139 S. Ct. at 527. "'[P]arties can agree to arbitrate

"gateway" questions of "arbitrability," such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" *Crewe v. Rich Dad Educ., LLC*, 884 F. Supp. 2d 60, 84 (S.D.N.Y. 2012) (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein*, 139 S. Ct. at 529.

Coppedge and Theriault are bound by the January 2024 Terms, which clearly delegate arbitrability issues to the arbitrator:

> The parties further agree that the determination of the scope, enforceability, or applicability of this Arbitration Agreement, including, but not limited to any claim that all any part thereof of this Arbitration Agreement is void or voidable, whether a claim is subject to arbitration, and any dispute regarding the payment of administrative or arbitrator fees (including the timing of such payments and remedies for nonpayment) will be resolved exclusively by final and binding arbitration in accordance with this Arbitration Agreement.

(Floyd Dec. Ex. 10.)

The February 2017, July 2019, and September 2021 Terms delegate arbitrability issues to the arbitrator by incorporating arbitrator rules that contain such a clause. The July 2019 and September 2021 Terms contain a provision applying JAMS Streamlined Rules and Procedures, and the February 2017 Terms incorporate JAMS Optional Expedited Procedure. (Feb. 2017 Terms, ¶13.B.; "Arbitration", July 2019 Terms; Arbitration Agreement §(a), Sept. 2021 Terms.) JAMS Streamlined Rule 8(b) and JAMS Comprehensive Rule 11(b) state:

> 8(b): Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is

> sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.
>
> 11(b): Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

This Court and others have found that by incorporating the JAMS Rules (or other similarly worded arbitration rules delegating jurisdiction and arbitrability to the arbitrator), the parties have "clearly and unmistakably" delegated arbitrability to the arbitrator. *See, e.g., Bosse v. N.Y. Life Ins. Co.*, 992 F.3d 20, 29 (1st Cir. 2021) ("This Court is clear that incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability issues to the arbitrator.").[5] As the parties "clearly and unmistakably" delegated questions of arbitrability to the arbitrator, any challenge concerning the existence, scope, or validity of the agreement must be decided by an arbitrator.[6]

### C. Though Not For The Court To Decide, The Arbitration Clauses Are Valid And Enforceable.

Although this Court should not reach the issue, this dispute must be arbitrated because no "grounds . . . exist at law or in equity for the revocation of [the] contract." 9 U.S.C. § 2. Any

[5] *See also Neighborly Cap. Co. v. Schumacher Ctr. for a New Econ.*, 2024 WL 1178458, at *4 (D. Mass. Mar. 19, 2024) ("[B]y incorporating the JAMS arbitration rules into the Agreement, the contracting parties delegated the question [of] arbitrability to the arbitrator."); *Tannatt v. Varonis Sys., Inc.*, 2019 WL 830482, at *5 (D. Mass. Feb. 21, 2019) (same); *Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 105 (S.D.N.Y. 2017) (same).

[6] Any question as to which arbitration agreement applies to each Plaintiff is also for the arbitrator. *E.g., Johnson v. Oracle Am., Inc.*, 764 F. App'x 607 (9th Cir. 2019) (when "both agreements contained a clear delegation" district court "correctly ruled it was for the arbitrator to determine which contract defined the scope of arbitration"). So is any question of whether both The Athletic and The New York Times may invoke the arbitration agreements. *Apollo Computer, Inc. v. Berg*, 886 F.2d 469 (1st Cir. 1989); *In re Intuniv Antitrust Litig.*, 2021 WL 517386, at *6 (D. Mass. Feb. 11, 2021).

"unconscionability" argument would be entirely without merit. Under both Massachusetts and New York law, an arbitration agreement is unconscionable only if the plaintiff "show[s] **both** substantive unconscionability (that the terms are oppressive to one party) and procedural unconscionability (that the circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice and was subject to unfair surprise)." *Machado v. System4 LLC*, 28 N.E.3d 401, 414 (2015) (citation omitted and emphasis added); *Haft v. Haier US Appliance Sols., Inc.*, 578 F. Supp. 3d 436, 451-52 (S.D.N.Y. 2022). Neither factor is satisfied here. The arbitration agreements in the Terms are therefore not unconscionable.

### *1. The Arbitration Clauses Are Not Procedurally Unconscionable.*

The arbitration clauses are not procedurally unconscionable. Under Massachusetts law, courts assessing procedural unconscionability may look to whether an arbitration provision "was obscurely worded, buried in fine print in the contract, or proposed under other circumstances suggesting unfairness," as well as whether "the process leading up to its formation" was oppressive. *Bekele v. Lyft, Inc.*, 199 F. Supp. 3d 284, 301 (D. Mass. 2016), *aff'd*, 918 F.3d 181 (1st Cir. 2019) (citation and quotation marks omitted). Likewise, under New York law, procedural unconscionability "typically is established by showing high pressure commercial tactics, inequality of bargaining power, deceptive practices and language in the contract, and an imbalance in the understanding and acumen of the parties." *Sea Tow Servs. Int'l, Inc. v. Tampa Bay Marine Recovery, Inc.*, 632 F. Supp. 3d 91, 115 (E.D.N.Y. 2022) (internal citations omitted).

Here, Plaintiffs cannot establish procedural unconscionability because the arbitration clauses are conspicuous, use capitalized terms for emphasis, and are clearly delineated in their own sections. For example, the January 2024 Terms have a bolded heading that says "How will we resolve disputes?" immediately followed by a bolded statement saying, "PLEASE READ THIS SECTION CAREFULLY. IT AFFECTS YOUR LEGAL RIGHTS, INCLUDING YOUR

RIGHT TO FILE OR PARTICIPATE IN A LAWSUIT IN COURT." (Floyd Dec. Ex. 10.) That section goes on to include "Arbitration Agreement" in bold, followed by lettered subsections with bolded headings. Similarly, the July 2019 Terms, agreed to by Plaintiff Cuesta, include an italicized "Arbitration" heading that ended in two bolded sentences, the latter of which was all-caps, emphasizing that arbitrations would be individual and that the parties were waiving their right to a jury trial. (Floyd Dec. Ex. 16.) *See Bekele v. Lyft, Inc.*, 199 F. Supp. 3d 284, 301-02 (D. Mass. 2016) (no procedural unconscionability where arbitration provision used "fairly clear language" and was proceeded by a "clearly-worded" header identifying it as an arbitration provision), *aff'd*, 918 F.3d 181 (1st Cir. 2019); *Lawrence v. NYC Med. Prac., P.C.*, 2023 WL 4706126, at *11 (S.D.N.Y. July 21, 2023) (finding arbitration provision's "clear, all-caps language significantly militates against finding the agreements to be procedurally unconscionable").

The arbitration clauses are also plainly worded such that they would be understood by consumers. For example, the January 2024 Terms state that the arbitration agreement "requires you to arbitrate certain disputes and claims with The Athletic and limits the manner in which you can seek relief from The Athletic." (Floyd Dec. Ex. 10.) It then goes on to specify in equally plain language why types of disputes are covered by the arbitration agreement and the limits on manners of seeking relief. Likewise, the July 2019 Terms provided that "[a]ny dispute arising from or relating to the subject matter of these terms shall be finally settled . . . by one commercial arbitrator" and refers to "the obligation to arbitrate disputes." Under these terms, no reasonable consumer could claim "unfair surprise" that their claims are subject to arbitration. *See Bekele*, 199 F. Supp. 3d at 301-02; *Lawrence*, 2023 WL 4706126, at *11.

Both the 2021 and the 2024 Terms also contain an easy-to-understand opt-out provision. (Floyd Dec. Exs. 7, 10.) There is no record of any Plaintiff opting out of arbitration. (Floyd Dec. ¶ 56.) Courts in both Massachusetts and New York have found that opt-out provisions like the ones here evidence that the contract is not one of adhesion. *See*, *e.g.*, *Perez-Tejada v. Mattress Firm, Inc.*, No. CV 17-12448-DJC, 2019 WL 830450, at *7 (D. Mass. Feb. 21, 2019) (arbitration provision not procedurally unconscionable where there was a choice to opt out within 30 days); *Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 525 (E.D.N.Y. 2017) (collecting cases and noting "An agreement is not procedurally unconscionable if there is a meaningful opportunity to opt out."). Accordingly, Plaintiffs cannot demonstrate procedural unconscionability.

***2. The Arbitration Clauses Are Not Substantively Unconscionable.***

Nor are the arbitration clauses substantively unconscionable under Massachusetts or New York law. Here, all of the relevant agreements are mutual: both parties are required to arbitrate their claims; both parties retain the right to seek equitable and injunctive relief under certain circumstances from a court rather than through arbitration; and both parties waive their rights to a jury trial.[7] *See Emmannuel v. Handy Techs., Inc.*, 442 F. Supp. 3d 385 (D. Mass. 2020) (no substantive unconscionability where arbitration provision applied to both parties equally), *aff'd sub nom. Emmannuel v. Handy Techs., Inc.*, 992 F.3d 1 (1st Cir. 2021); *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 573 (S.D.N.Y. 2009) ("[T]he Arbitration Provision is not substantively unconscionable because it equally binds [defendant] and [plaintiff] to arbitration, and therefore does not unreasonably favor [defendant].")

---

[7] Feb. 2017 Terms, ¶13.B.; "Choice of Law; Arbitration", July 2019 Terms; "Arbitration Agreement" §§(a), (c), (d), Sept. 2021 Terms; "Arbitration Agreement" §§(a), (c), (d), Aug. 2023 Terms; "Arbitration Agreement", Jan. 2024 Terms.

None of the arbitration agreements contain the sorts of provisions that have been found to suggest substantive unconscionability. For example, none of the terms reduce the statute of limitations, nor include any other provision that would limit the remedies available to Plaintiffs or other consumers. *See Vaiano v. United Nat'l Corp.*, 2024 WL 2134389, at *6 (D. Mass. May 13, 2024) (no substantive unconscionability where "Plaintiff retained his right to pursue any claim, including statutory claims"). Moreover, Massachusetts and New York courts reject substantive unconscionability challenges to arbitration clauses where, as in the 2024 Terms, the consumer will not have to pay arbitration fees. *See, e.g.*, *Bekele*, 918 F.3d at 188; *Martinez v. GAB.K, LLC*, 2024 WL 3460983, at *4 (S.D.N.Y. July 18, 2024). The arbitration agreement is exceedingly fair and, therefore, it is not substantively unconscionable.

### D. Though Not For The Court To Decide, The Agreement To Arbitrate Encompasses Plaintiffs' Claims.

The broad arbitration clauses in the Terms unquestionably encompass Plaintiffs' claims, although this issue is for the arbitrator to determine. *Rent-A-Ctr.*, 561 U.S. at 68–69. Under the FAA, the scope of the arbitration agreement is governed by federal law. *Bekele v. Lyft, Inc.*, 199 F. Supp. 3d 284, 313 (D. Mass. 2016), *aff'd*, 918 F.3d 181 (1st Cir. 2019). Courts must give "due regard . . . to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration." *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 376 (1st Cir. 2011) (citation and quotation marks omitted).[8]

Plaintiffs' claims fall within the broad arbitration provisions for all sets of Terms that could potentially apply. The January 2024 Terms, to which Plaintiffs Coppedge and Theriault

---

[8] *See also AT&T Techs., Inc. v. CWA*, 475 U.S. 643, 650 (1986) ("[T]here is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.") (internal quotations omitted).

agreed, require arbitration of "any and all disputes between us, including but not limited to claims arising out of or relating to any aspect of the relationship between us, the Terms of Service, or your use of the Services." The July 2019 Terms, to which Cuesta agreed, contains similarly broad "arising from or relating to" language, covering "[a]ny dispute arising from or relating to the subject matter of the[] Terms" and the word "Terms" includes the provisions in The Athletic's Privacy Policy, which is linked in the agreement. Thus the arbitration provision in the July 2019 Terms covers disputes relating to the subject matter of the Privacy Policy. The presumption favoring arbitrability applies with particular force to broad "arising from or relating to" language. *See Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 8-9 (1st Cir. 2014); *Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995). *See also Alfia v. Coinbase Glob., Inc.*, 2022 WL 3205036, at *3 (N.D. Cal. July 22, 2022) (arbitration provision encompassed privacy-related dispute where privacy policy was incorporated by reference into user agreement).[9]

### E. Though Not An Issue For The Court, Arbitration May Not Proceed On A Class-Wide Basis.

Although the issue is for the arbitrator rather than this Court, the February 2017, July 2019, September 2021, and January 2024 Terms all contain unambiguous waivers of any right

[9] Plaintiffs' claims plainly "arise from or relate to" the alleged use and disclosure of personally identifiable information. (Compl. ¶¶ 34–41, 84.) All of the relevant Privacy Policies describe the collection, use, protection, and handling of personally identifiable information. (Floyd Dec. ¶¶ 66-67; Exs. 19-27.) And, if either the September 2021 Terms or the February 2017 Terms govern this dispute for any Plaintiff, they also encompass Plaintiffs' claims. The February 2017 Terms included a "Privacy" section that governed "the collection, use and disclosure of your personally identifiable information", and required arbitration of "any claim, dispute, or controversy . . . arising out of or in connection with or relating to these Terms of Service, or the breach or alleged breach thereof . . . ." The September 2021 terms likewise expressly incorporated and hyperlinked to the Privacy Policy in effect, and mandate arbitration of "any dispute, claim, question, or disagreement arising out of or relating to the subject matter of these Terms."

for Plaintiffs to proceed with a class action. The applicable clauses are set out in all caps, even bolded in the July 2019 Terms, and they are unquestionably enforceable. The Supreme Court has consistently upheld class waivers in arbitration agreements. *See, e.g.*, *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1419 (2019); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1623 (2018).

### F. The Court Should Stay And Administratively Close This Action.

Under the FAA, an order to stay the pending action may be granted concurrently with a motion to compel arbitration. *See* 9 U.S.C. § 3. Defendants therefore respectfully request that this case be stayed pending the arbitration and administratively closed. *E.g.*, *AsymmetRx, Inc. v. Dako Denmark A/S*, 626 F. Supp. 2d 182, 183 (D. Mass. 2009) (granting request for stay and administratively closing the case).

## IV. CONCLUSION

For the foregoing reasons, The Athletic and The New York Times respectfully request that the Court compel Plaintiffs to arbitrate their claims on an individual basis as they agreed to do, stay this action, and administratively close this matter.

Respectfully submitted,

Dated: May 2, 2025

THE NEW YORK TIMES COMPANY AND THE ATHLETIC MEDIA COMPANY

By its Attorneys,

/s/ *Tony K. Lu*
Tony K. Lu (BBO# 678791)
DENTONS US LLP
101 Federal Street
Suite 1900
Boston, Massachusetts 02110
Telephone: (617) 235-6817
Facsimile: (617) 235-6899
Email: tony.lu@dentons.com

Kristen C. Rodriguez (*pro hac vice*)
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: kristen.rodriguez@dentons.com

**CERTIFICATE OF SERVICE**

I certify that on May 2, 2025, I caused to be filed electronically a true copy of the foregoing document with the Clerk of the Court using the CM/ECF system, which will notify the parties of record via electronic notification.

/s/ *Tony K. Lu*