**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

DAVIN COPPEDGE, MAX THERIAULT, and ESTEBAN CUESTA individually and as a representative of all others similarly situated,

Plaintiffs,

vs.

THE ATHLETIC MEDIA COMPANY and THE NEW YORK TIMES COMPANY,

Defendants.

Case No. 1:24-cv-12312-JEK

**DECLARATION OF COREY FLOYD IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION**

I, Corey Floyd, hereby declare as follows:

1. I am over the age of 18, and I submit this declaration in support of Defendants The Athletic Media Company's ("The Athletic") and The New York Times Company's ("The New York Times") Motion to Compel Arbitration in the putative class action brought by Davin Coppedge, Max Theriault, and Esteban Cuesta (together, the "Plaintiffs").

2. I attest to each fact stated in this declaration based on my personal knowledge and my review of records kept by The Athletic in its regular course of business and, if called as a witness, I could and would competently and truthfully testify to these facts.

3. I am the Vice President of Engineering at The Athletic. I have held this role since December 12, 2022, when I first joined The Athletic. My responsibilities include oversight for the engineering team that develops, implements, and maintains The Athletic's user database and subscription and account sign up processes.

4. The Athletic is a subscription-based online sports news outlet.

5. The New York Times has owned The Athletic since 2022.

6. The Athletic's full news coverage is available to subscribers only, but users can access certain content without a subscription in limited circumstances.

7. Users can access certain content on The Athletic by setting up a free account with The Athletic.

8. Beginning in September 2022, New York Times users with a New York Times All-Access or Home Delivery subscription could access all of The Athletic's coverage through their New York Times subscription. New York Times account holders could also access certain content of The Athletic's coverage by logging in with their New York Times account credentials, depending on their subscription type.

9. In the course of its regularly conducted business activities, The Athletic maintains records regarding its users' interactions with The Athletic, including when and how its users create free accounts, as well as when and how its subscribers purchase a subscription to The Athletic, when they log in, and when they access certain content. These records are stored automatically in The Athletic's user database, at or near the time of the user's or subscriber's interaction with The Athletic. Creating such records is a regular practice of The Athletic.

10. At the direction of counsel, I queried The Athletic's user database for users matching the first and last names of the Plaintiffs identified in the Complaint. I exported excerpts from our user database for each of the Plaintiffs. The exports associated with Plaintiffs Coppedge, Theriault, and Cuesta are attached to this Declaration as **Exhibits 1-3**.

11. The Athletic, in its ordinary course of business, maintains records of the account creation screen flows deployed over time across platforms, along with information as to when those screen flows were implemented online.

12. Based on the date and the method by which each Plaintiff created an account or subscribed (*i.e.*, on the web, via mobile app, or on a mobile browser), I was able to determine which screen flows the individual Plaintiffs would have seen during their respective interactions with The Athletic.

**Davin Coppedge's Account History With The Athletic**

13. Using name searches, I located two user accounts associated with the name "Davin Coppedge." The first account, with User ID ending in -0777, is assigned to one email address for a "Davin Coppedge" ("Coppedge Account 1"). The second user account, with the User ID ending in -1524, is assigned to a different email address for a "Davin Coppedge" ("Coppedge Account 2"). However, the IP addresses associated with both accounts are the same and are located in Massachusetts.

14. A true and correct copy of the entries exported from The Athletic's user database reflecting the two user accounts associated with the name "Davin Coppedge" is contained in the chart attached as **Exhibit 1,** with email addresses and IP addresses redacted.

***Mr. Coppedge's First Account With The Athletic***

15. As shown in Exhibit 1, Mr. Coppedge through Coppedge Account 1, has subscribed multiple times to The Athletic. Mr. Coppedge first created an account on September 7, 2018 via our iOS mobile app. Ex. 1 at "account_creation_date". He then first subscribed to The Athletic on January 5, 2019. Ex. 1 at "subscription_start_date". He subscribed again on September 27, 2020. Ex. 1 at "subscription_start_date". Mr. Coppedge subscribed another time on April 22, 2022. Ex. 1 at "subscription_start_date".

16. When Mr. Coppedge created Coppedge Account 1 in 2018, he was presented with the below screen, **Figure A**, which is attached as **Exhibit 4**. Upon entering a first name, last name, email address, and password, the red button labeled "Create Account" would have become clickable, as shown below:




*Figure A*

17. As seen in Figure A, just below the "Create Account" button, it states "By registering, you agree with The Athletic's Terms of Service and Privacy Policy." This statement would have been visible without scrolling on the screen. The text of the statement is the same size font as other information on the screen. Users could not create an account using their email without clicking on the red button in Figure A.

18. In Figure A, the words "Terms of Service" and "Privacy Policy" were separately hyperlinked to the respective Terms of Service and Privacy Policy in place at the time, such that if a person clicked on the words "Terms of Service" within the statement, the Terms of Service would have opened in the user's browser window. The Terms of Service that were linked at the time that Mr. Coppedge registered for his account in September 2018 were the Terms effective as of February 28, 2017 (the "February 2017 Terms"), attached as **Exhibit 5**.

***Mr. Coppedge Creates His Second Account With The Athletic***

19. On August 17, 2021, Mr. Coppedge simultaneously created an account and subscribed with a different email address, creating "Coppedge Account 2" via our iOS mobile app. *See* Exhibit 1.

20. To create his account, Mr. Coppedge was presented with the following screen on August 17, 2021 (**Figure B**), which is attached as **Exhibit 6**. As shown below, just below the "Continue with" buttons, it states "By creating an account, you agree to The Athletic's Terms of Service and Privacy Policy." This statement would have been visible without scrolling on the screen. The text of the statement is in a high contrast color to the background, and the words "Terms of Service" and "Privacy Policy" were underlined and hyperlinked to the Terms and Privacy Policy in effect at the time the user created an account. Users could not create an account without clicking on one of the Continue with buttons on Figure B.




*Figure B*

21. The Terms of Service linked on Figure B as of when Coppedge Account 2 was created were the Terms of Service dated September 8, 2021 (the "September 2021 Terms"), which were posted as of August 5, 2021. The September 2021 Terms are attached as **Exhibit 7**.

***Mr. Coppedge Accesses The Athletic With His New York Times Account***

22. Starting in September 2022, users with a New York Times account could log in to The Athletic with their New York Times account credentials, thereby linking accounts if a user had accounts with both The Athletic and The New York Times. Users were redirected to the custom landing page shown at **Figure C** below, and attached as **Exhibit 8** (the "Custom Landing Page"):




*Figure C*

23. The Custom Landing Page specified that "By continuing . . . ," the user understood that their "email address and account information will be shared with The Athletic" and the user "agree[d] to [The Athletic's] their Terms of Service and Privacy Policy." This

statement was visible on the screen without scrolling. The words "Terms of Service and Privacy Policy" in the second sentence were hyperlinked to a separate webpage containing the applicable Terms and Privacy Policy based on the date the user accessed the Custom Landing Page.

24. A user could not use their New York Times account to access The Athletic's content without clicking on one of the four buttons on the Custom Landing Page.

25. Our records reflect that Mr. Coppedge first accessed The Athletic with his New York Times account credentials on May 23, 2023, with the e-mail address that matched the e-mail address associated with Coppedge Account 1. This is shown in Exhibit 1 under the column "nyt_account_completion_timestamp," which is populated in our systems when a registered New York Times user logged into The Athletic with their New York Times log-in credentials for the first time. Before he could access The Athletic using his New York Times credentials, Mr. Coppedge had to either fill in his email address and click "Continue" or click one of the third party sign in buttons that stated "Continue with…" as shown in Figure C. On May 23, 2023, the words "Terms of Service and Privacy Policy" were hyperlinked to a page containing the September 2021 Terms (previously attached as Exhibit 7).

***The Athletic Sends Mr. Coppedge Notice of Update to the Terms of Service***

26. On December 15, 2023, an email was sent to the email addresses associated with Coppedge Account 1 and Coppedge Account 2 informing Mr. Coppedge of a forthcoming update to the Terms of Service that "include revisions to the arbitration clause that covers any disputes relating to your relationship with us as an account holder, including changes to where and how to file an arbitration and the procedures governing the arbitration" (the "Dec. 2023 Email"). The subject of the Dec. 2023 Email was "We have updated our U.S. Terms of Service." A true and

correct copy of the body of the Dec. 2023 Email appears below as **Figure D** and is attached as **Exhibit 9**.

**The Athletic**

We are writing to let you know that we have updated our U.S. Terms of Service, which apply to your use of our products and services. These terms will apply to U.S. residents only.

These updates include revisions to the arbitration clause that covers any disputes relating to your relationship with us as an account holder, including changes to where and how to file an arbitration and the procedures governing the arbitration.

These updates do not apply to our affiliates at The New York Times, which have their own Terms of Service.

We encourage you to review the updated U.S. Terms of Service, along with our other legal policies, available in our Policy Center. By continuing to use our products and services on or after January 15, 2024, you agree to our updated Terms of Service.

There is no action needed from you regarding this email. If you have any questions, please do not hesitate to contact our support team.

Please note, this is a legal notice, which is why you are receiving it even if you have opted out of our marketing emails.

Sincerely,
The Athletic

*Figure D*

27. As seen in Figure D, the Dec. 2023 Email hyperlinked to the updated U.S. Terms of Service. Clicking on the link would have opened the January 15, 2024 Terms of Service (the "January 2024 Terms"), attached as **Exhibit 10**.

28. The Athletic's records reflect the delivery of the Dec. 2023 Email (Exhibit 9) to the email addresses associated with Coppedge Account 1 and Coppedge Account 2. Those records are attached as **Exhibit 11.**

29. The records of the Dec. 2023 Email are kept in an email management database. The records of the delivery are made at or near the time of the email delivery and making such records occurs in the regular course of business. Had the Dec. 2023 Email not been successfully delivered, the email management database would have included event logs associated with Mr. Coppedge's accounts indicating an email bounce or skip. No such logs were present on either of his accounts for the Dec. 2023 Email.

***Mr. Coppedge Clicked on 2024 Overlay***

30. Also on December 15, 2023, The Athletic began presenting existing account holders with an overlay on its content, a true and correct copy is attached as **Exhibit 12** and copied below as **Figure E** (the "2024 Overlay"). A screen capture of the 2024 Overlay was kept in the ordinary course of The Athletic's business, along with information as to the date of its implementation on The Athletic's platforms. The 2024 Overlay appeared on top of the content, and a user could not access any of The Athletic's content without first clicking on the red button labeled "I Accept."




*Figure E*

31. As shown in Figure E above, under the large bolded header titled "**Updated Terms**," readers were informed as follows: "We have made some changes to our U.S. Terms of Service, including how we will resolve disputes between us. These terms will apply to U.S. residents only. By clicking the button below, you acknowledge and accept our updated terms. To review the full terms, **click here**." The bolded words "click here" were hyperlinked to the January 2024 Terms.

32. The 2024 Overlay was coded such that on or after December 15, 2024, all logged-in account holders were presented with the Overlay during their first visit to The Athletic's website after the new Terms of Service were posted online, when such visits did not originate from a push notification to their phone.

33. Our records reflect that Mr. Coppedge, through Coppedge Account 1, clicked on "I Accept" on January 10, 2024, at 6:14 p.m. Coordinated Universal Time (UTC). This is shown in Exhibit 1, under the column labeled "ath_terms_and_conditions".

34. The "ath_terms_and_conditions" column reflects the exact date and time that a user last accepted the Terms. If the date in the "ath_terms_and_conditions" field post-dates the "account_creation_date" field (a field that reflects the date and time that a user created an account, which requires acceptance of the Terms), then the date and time in the "ath_terms_and_conditions" field indicates acceptance of the Terms by clicking on an overlay, such as the 2024 Overlay.

35. Here, Mr. Coppedge's "ath_terms_and_conditions" date for Coppedge Account 1 (January 10, 2024) post-dates his "account_creation_date" date (September 7, 2018). The only event trigger that would have caused the "ath_terms_and_conditions" field to populate on January 10, 2024 for a user who had an existing account with The Athletic and who had already agreed to the Terms (like Mr. Coppedge had through the Coppedge Account 1) was if that user clicked on the 2024 Overlay. Therefore, the "ath_terms_and_conditions" field confirms that Mr. Coppedge clicked on the 2024 Overlay on January 10, 2024 at 6:14 p.m. UTC.

**Max Theriault's Account History with The Athletic**

36. Using searches for his name, I located one user named "Max Theriault." He was assigned a User ID ending in -1960 in our user database and had an IP address in Massachusetts.

37. A true and correct copy of the entries exported from The Athletic's user database reflecting the user account associated with the name "Max Theriault" is contained in the chart attached as **Exhibit 2,** with the email address and IP address redacted.

***Mr. Theriault Accesses The Athletic With His New York Times Account***

38. Mr. Theriault accessed The Athletic with his New York Times account starting on May 31, 2023 and simultaneously created an account with The Athletic. This is shown in Exhibit 2 under the columns "account_creation_date" and "nyt_account_completion_

timestamp". On May 31, 2023, Mr. Theriault was presented with the Custom Landing Page as shown in Exhibit 8 (Figure C above), before he was permitted to access The Athletic's content. To do so, Mr. Theriault had to either fill in his email address and click "Continue" or click one of the third party sign in buttons that stated "Continue with…". As discussed above with regard to Mr. Coppedge, a user could not use their New York Times account to access The Athletic's content without clicking on one of the four buttons on the Custom Landing Page.

39. As with Mr. Coppedge, the words "Terms of Service and Privacy Policy" in the second sentence of the Custom Landing page were hyperlinked to a separate webpage containing the September 2021 Terms (Exhibit 7) and the applicable Privacy Policy.

***The Athletic Sends Mr. Theriault Notice of Updated Terms of Service***

40. The Athletic's records reflect the delivery of the Dec. 2023 Email (Exhibit 9) to the email address associated with Mr. Theriault's account. Those records are attached as **Exhibit 13**. Had the Dec. 2023 Email not been successfully delivered, the email management database would have included an event log associated with Mr. Theriault's account indicating an email bounce or skip. No such logs were present on his account for the Dec. 2023 Email.

***Mr. Theriault Clicked on the 2024 Overlay***

41. The Athletic's records confirm that on January 10, 2024, when Mr. Theriault accessed the site, he was presented with the 2024 Overlay, and had to click "I Accept" before continuing on the site.

42. Our records reflect that Mr. Theriault clicked on "I Accept" on the 2024 Overlay on January 10, 2024, at 11:57 a.m. UTC as can be seen in Exhibit 2 under the column "ath_terms_and_conditions".

43. As described above with Mr. Coppedge, the "ath_terms_and_conditions" column reflects the exact date and time that a user last accepted the Terms. If the date in the "ath_terms_and_conditions" field post-dates the "account_creation_date" field (a field that reflects the date and time that a user created an account, which requires acceptance of the Terms), then the date and time in the "ath_terms_and_conditions" field indicates acceptance of the Terms by clicking on an overlay, such as the 2024 Overlay.

44. Here, Mr. Theriault's "ath_terms_and_conditions" date for his account (January 10, 2024) post-dates his "account_creation_date" date (May 31, 2003). The only event trigger that would have caused the "ath_terms_and_conditions" field to populate on January 10, 2024 for a user who had an existing account with The Athletic and who had already agreed to the Terms (like Mr. Theriault had through his existing account) was if that user clicked on the 2024 Overlay. Therefore, the "ath_terms_and_conditions" field confirms that Mr. Theriault clicked on the 2024 Overlay on January 10, 2024 at 11:57 a.m. UTC.

45. The Athletic's January 2024 Terms included a reference and link to the Privacy Policy then in effect.

**<u>Esteban Cuesta's Account History with The Athletic</u>**

46. Using searches for his name, I located three user accounts in our user database that were associated with the name "Esteban Cuesta." These three user accounts were assigned User IDs ending in -3809 ("Cuesta Account 1"), -7730 ("Cuesta Account 2"), and -7671 ("Cuesta Account 3"). These user accounts had IP addresses in either Brooklyn, NY or New York, NY.

47. A true and correct copy of the entries exported from The Athletic's user database reflecting the three user accounts associated with the name "Esteban Cuesta" is contained in the chart attached as **Exhibit 3**, with email addresses and IP addresses redacted.

***Mr. Cuesta Creates His First Account With The Athletic***

48. On November 7, 2018, Mr. Cuesta created Cuesta Account 1 via mobile app. *See* Exhibit 3 at "account_creation_date". He was presented with the following screen, **Figure F**, attached as **Exhibit 14**):




*Figure F*

49. To set up his new account, Mr. Cuesta was required to click on one of the "SIGN UP" buttons presented on the screen. Under the "SIGN UP" buttons, it states "By signing up, I agree to The Athletic **terms of service** and **privacy policy**." This statement would have been visible without scrolling on the screen. The words "**terms of service**" were bolded and hyperlinked to the February 2017 Terms (Exhibit 5) as of the date that Mr. Cuesta signed up for his first account.

50. Based on my understanding of the evolution of The Athletic's practices, it is likely that The Athletic had not yet implemented a mechanism by which a user's creation of an account with The Athletic would be reflected in the "ath_terms_and_conditions" column in Exhibit 3 when Mr. Cuesta created Cuesta Account 1, which, based on my investigation thus far, is why the data point is blank for Cuesta Account 1.

***Mr. Cuesta Creates His Second Account with The Athletic***

51. On July 21, 2020, Mr. Cuesta created Cuesta Account 2 and subscribed to The Athletic via the iOS mobile app. *See* Exhibit 3 at "account_creation_date". He was presented with the following screen, **Figure G**, attached as **Exhibit 15**.




*Figure G*

52. As shown on Figure G, to set up his new account, Mr. Cuesta was required to click on one of the "Continue" or "Sign Up" buttons presented on the screen. Below these buttons, it states "By creating an account above, you agree to The Athletic's Terms of Service and Privacy Policy." This statement would have been visible without scrolling on the screen. The words "Terms of Service" were underlined and hyperlinked to the July 25, 2019 Terms of Service (the "July 2019 Terms"), attached as **Exhibit 16**.

***Mr. Cuesta Creates His Third Account with The Athletic***

53. On September 1, 2020, Mr. Cuesta created Cuesta Account 3 with The Athletic via mobile web. *See* Exhibit 3 at "account_creation_date". To create this third account, he was presented with the following screen, **Figure H**, also attached as **Exhibit 17**, which stated, "By creating an account above, you agree to The Athletic's Terms of Service and Privacy Policy." This statement was visible without scrolling. Within the statement, the words "Terms of Service" were underlined and hyperlinked to the July 2019 Terms (Exhibit 16).




*Figure G*

***The Athletic Sends Mr. Cuesta Notice of Updated Terms of Service***

54. The Athletic's records reflect the delivery of the Dec. 2023 Email (Exhibit 9) to the email addresses associated with Cuesta Account 1, Cuesta Account 2, and Cuesta Account 3. **Exhibit 18**. Had the Dec. 2023 Email not been successfully delivered, the email management database would have included an event log associated with Mr. Cuesta's accounts indicating an email bounce or skip. No such logs were present on any of his accounts for the Dec. 2023 Email.

**<u>The Athletic's Terms of Service Over Time</u>**

55. All of The Athletic's Terms in effect at the times Plaintiffs created their accounts or otherwise agreed to the Terms contained an arbitration clause choosing JAMS or AAA as the arbitrator, as well as a class action waiver.

56. There is no record of any of the accounts associated with Mr. Theriault, Mr. Coppedge, or Mr. Cuesta opting out of an arbitration agreement.

57. The February 2017 Terms, attached in full at Exhibit 5**,** contained the following language in its introduction:

> PLEASE READ THIS AGREEMENT CAREFULLY TO ENSURE THAT YOU UNDERSTAND EACH PROVISION. THIS AGREEMENT CONTAINS A MANDATORY ARBITRATION OF DISPUTES PROVISION THAT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS.

Ex. 5 at 1.

58. The February 2017 Terms also contained the following relevant arbitration agreement and class action waiver:

> 13.B. **Arbitration.** READ THIS SECTION CAREFULLY BECAUSE IT REQUIRES THE PARTIES TO ARBITRATE THEIR DISPUTES AND LIMITS THE MANNER IN WHICH YOU CAN SEEK RELIEF FROM COMPANY. In the unlikely event that The Athletic Media Company has not been able to resolve a dispute it has with you after 60 days, we each agree to resolve any claim, dispute, or controversy (excluding any The Athletic Media

> Company claims for injunctive or other equitable relief) arising out of or in connection with or relating to these Terms of Service, or the breach or alleged breach thereof (collectively, "Claims"), by binding arbitration by the Judicial Mediation and Arbitration Services ("JAMS") under the Optional Expedited Arbitration Procedures then in effect for JAMS, except as provided herein.
>
> ALL CLAIMS MUST BE BROUGHT IN THE PARTIES' INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION, COLLECTIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION OR OTHER REPRESENTATIVE PROCEEDING. THIS WAIVER APPLIES TO CLASS ARBITRATION, AND, UNLESS WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS. YOU AGREE THAT, BY ENTERING INTO THIS TERMS OF SERVICE, YOU AND COMPANY ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION, .COLLECTIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, OR OTHER REPRESENTATIVE PROCEEDING OF ANY KIND.

Ex. 5 at 9.

59. The July 2019 Terms, attached in full at Exhibit 16, have the following arbitration provision and class action waiver:

> *Choice of Law; Arbitration.* These Terms are governed by and will be construed under the laws of the State of California, without regard to the conflicts of laws provisions thereof. Any dispute arising from or relating to the subject matter of these Terms shall be finally settled in San Francisco County, California, in English, in accordance with the Streamlined Arbitration Rules and Procedures of Judicial Arbitration and Mediation Services, Inc. ("JAMS") then in effect, by one commercial arbitrator with substantial experience in resolving intellectual property and commercial contract disputes, who shall be selected from the appropriate list of JAMS arbitrators in accordance with such Rules. Judgment upon the award rendered by such arbitrator may be entered in any court of competent jurisdiction. Notwithstanding the foregoing obligation to arbitrate disputes, each party shall have the right to pursue injunctive or other equitable relief at any time, from any court of competent jurisdiction. For all purposes of these Terms, the parties consent to exclusive jurisdiction and venue in the state or federal courts located in, respectively, San Francisco County, California, or the Northern District of California. **Any arbitration under these Terms will take place on an individual basis: class arbitrations and class actions are not permitted. YOU UNDERSTAND AND AGREE THAT BY ENTERING INTO THESE TERMS, YOU AND THE ATHLETIC ARE EACH WAIVING THE RIGHT TO TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION.**

Ex. 16 at 10.

60. The September 2021 Terms, attached in full at Exhibit 7, contain the following class action waiver and arbitration clauses:

> *Arbitration Agreement*. Please read the following ARBITRATION AGREEMENT carefully because it requires you to arbitrate certain disputes and claims with The Athletic and limits the manner in which you can seek relief from The Athletic. Both you and The Athletic acknowledge and agree that for the purposes of any dispute arising out of or relating to the subject matter of these Terms, The Athletic's officers, directors, employees, and independent contractors ("Personnel") are third-party beneficiaries of these Terms, and that upon your acceptance of these Terms, Personnel will have the right (and will be deemed to have accepted the right) to enforce these Terms against you as the third-party beneficiary hereof.
>
> (a) Arbitration Rules; Applicability of Arbitration Agreement. The parties shall use their best efforts to settle any dispute, claim, question, or disagreement arising out of or relating to the subject matter of these Terms directly through good-faith negotiations, which shall be a precondition to either party initiating arbitration. If such negotiations do not resolve the dispute, it shall be finally settled by binding arbitration in San Francisco, California. The arbitration will proceed in the English language, in accordance with the JAMS Streamlined Arbitration Rules and Procedures (the "Rules") then in effect, by one commercial arbitrator with substantial experience in resolving intellectual property and commercial contract disputes. The arbitrator shall be selected from the appropriate list of JAMS arbitrators in accordance with such Rules. Judgment upon the award rendered by such arbitrator may be entered in any court of competent jurisdiction.
>
> Ex. 7 at 10-11.

(d) Waiver of Jury Trial. YOU AND THE ATHLETIC WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO GO TO COURT AND HAVE A TRIAL IN FRONT OF A JUDGE OR JURY. You and The Athletic are instead choosing to have claims and disputes resolved by arbitration. Arbitration procedures are typically more limited, more efficient, and less costly than rules applicable in court and are subject to very limited review by a court. In any litigation between you and The Athletic over whether to vacate or enforce an arbitration award, YOU AND THE ATHLETIC WAIVE ALL RIGHTS TO A JURY TRIAL, and elect instead to have the dispute be resolved by a judge.

(e) Waiver of Class or Consolidated Actions. ALL CLAIMS AND DISPUTES WITHIN THE SCOPE OF THIS ARBITRATION AGREEMENT MUST BE ARBITRATED OR LITIGATED ON AN INDIVIDUAL BASIS AND NOT ON A CLASS BASIS. CLAIMS OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR LITIGATED JOINTLY OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER. If, however, this waiver of class or consolidated actions is deemed invalid or unenforceable, neither you nor The Athletic is entitled to arbitration; instead, all claims and disputes will be resolved in a court as set forth in (g) below.

Ex. 7 at 11-12.

61. The September 2021 Terms also featured an opt-out clause:

(f) Opt-out. You have the right to opt out of the provisions of this Section by sending written notice of your decision to opt out to the following address: 332 Pine Street, Suite 900, San Francisco, CA 94104 postmarked within thirty (30) days of first

accepting these Terms. You must include (i) your name and residence address, (ii) the email address and/or telephone number associated with your account, and (iii) a clear statement that you want to opt out of these Terms' arbitration agreement.

Ex. 7 at 11.

62. The January 2024 Terms, attached in full at Exhibit 10, state in the introduction:

> PLEASE READ THESE TERMS OF SERVICE CAREFULLY, AS THEY GOVERN YOUR USE OF THE SITE AND SERVICES, PARTICULARLY THE SECTION TITLED "HOW WILL WE RESOLVE DISPUTES?" WHICH AFFECTS YOUR RIGHTS IN THE EVENT OF A DISPUTE BETWEEN US.

Ex. 10 at 1.

63. Further, under the section titled "How will we resolve disputes?" the January 2024 Terms state in pertinent part:

> **PLEASE READ THIS SECTION CAREFULLY. IT AFFECTS YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT TO FILE OR PARTICIPATE IN A LAWSUIT IN COURT.**

Ex. 10 at 13.

64. It goes on to state:

> YOU AND THE ATHLETIC AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER IN ARBITRATION OR LITIGATION ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, COLLECTIVE, CONSOLIDATED, PRIVATE ATTORNEY GENERAL, OR REPRESENTATIVE ACTION.

Ex. 10 at 13.

> The following **arbitration agreement ("Arbitration Agreement")** requires you to arbitrate certain disputes and claims with The Athletic and limits the manner in which you can seek relief from The Athletic. Both you and The Athletic acknowledge and agree that for the purposes of any dispute arising out of or relating to the subject matter of these Terms, The Athletic's officers, directors, employees, and independent contractors ("Personnel") are third-party beneficiaries of these Terms, and that upon your acceptance of these Terms, Personnel will have the right (and will be deemed to have accepted the right) to enforce these Terms against you as the third-party beneficiary hereof.

(a) **Arbitration Rules; Applicability of Arbitration Agreement.** The parties shall use their best efforts to settle any dispute, claim, question, or disagreement arising out of or relating to the subject matter of these Terms directly through good-faith negotiations, which shall be a precondition to either party initiating arbitration. If such negotiations do not resolve the dispute, it shall be finally settled by binding arbitration in the County of New York in the State of New York. The arbitration will proceed in the English language, in accordance with AAA Consumer Arbitration Rules (the "Rules") then in effect, by one commercial arbitrator. A copy of these rules is available at: https://www.adr.org/Rules. The arbitrator shall be selected from the appropriate list of AAA arbitrators in accordance with such Rules. Judgment upon the award rendered by such arbitrator may be entered in any court of competent jurisdiction.

The parties agree that this Arbitration Agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16.

(c) **Scope of This Arbitration Agreement.** You and The Athletic agree that the terms of this Arbitration Agreement govern any and all disputes between us including but not limited to claims arising out of or relating to any aspect of the relationship between us, the Terms of Service, or your use of the Services, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory (each a "Dispute" and collectively "Disputes").

(d) **No Class or Collective Arbitration Proceedings.** ANY ARBITRATION SHALL BE CONDUCTED IN AN INDIVIDUAL CAPACITY ONLY AND NOT AS A CLASS OR COLLECTIVE ACTION AND THE ARBITRATOR MAY AWARD RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO RESOLVE AN INDIVIDUAL PARTY'S CLAIM. NOTWITHSTANDING THIS ACKNOWLEDGEMENT AND AGREEMENT, ANY ARBITRATION INVOLVING YOU MAY PROCEED ON A CONSOLIDATED BASIS IF AND ONLY IF THE ATHLETIC PROVIDES ITS CONSENT TO CONSOLIDATE IN WRITING.

Ex. 10 at 14-15.

65. The January 2024 Terms also contain the following opt-out provision:

(m) **Opt-out.** You have the right to opt out and not be bound by the Arbitration Agreement by sending written notice of your decision to opt out to **legal@theathletic.com** with the subject line "ARBITRATION OPT-OUT." The notice must be sent within thirty (30) days of (a) December 15, 2023; or (b) your first use of the Services, whichever is later. Otherwise, you shall be bound to arbitrate disputes in accordance with the terms of these paragraphs. If you opt out of the Arbitration Agreement, you may exercise your right to a trial by jury or judge, as permitted by applicable law, but any prior existing agreement to arbitrate disputes under any prior Arbitration Agreement between you and The Athletic will not apply to claims not yet

> filed. If you opt out of the Arbitration Agreement The Athletic also will not be bound by it.
>
> Ex. 10 at 19.

**The Athletic's Privacy Policies Over Time**

66. Each of the different versions of The Athletic's Terms of Service that were in effect at the times Plaintiffs created their accounts or otherwise agreed to the Terms incorporated, referenced, and linked to The Athletic's Privacy Policy. The 2017 Terms stated "By accessing or using the Service, you signify that you have read, understood, and agree to be bound by this Terms of Service Agreement ("Agreement") and to the collection and use of your information as set forth in the The Athletic Media Company Privacy Policy (https://theathletic.com/privacy)." Ex. 5 at 1. The February 2017 Terms also addressed the "collection, use and disclosure of your personally identifiable information" in a section entitled "Privacy." Ex. 5 at 5. Further, the July 2019, September 2021, and January 2024 Terms stated, "These Terms include the provisions in this document, as well as those in the Privacy Policy…" with the term "Privacy Policy" hyperlinked to the current version of the Privacy Policy. Ex. 16 at 1; Ex. 7 at 1; Ex. 10 at 1.

67. Each of the different versions of The Athletic's Privacy Policy that were in effect since the earliest date of any of the Plaintiffs' account creation (September 7, 2018) addressed the collection, use, protection, and handling of personally identifiable information. These versions were effective on the following dates: April 7, 2017; July 24, 2019; December 30, 2019; September 8, 2021; September 9, 2022; December 22, 2022; March 21, 2023; June 29, 2023; and December 31, 2023. True and accurate copies of these Privacy Policies are attached as **Exhibits 19-27**, respectively.

**REMAINDER OF PAGE LEFT BLANK**

I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.

Executed at Dillon, CO, on this 2 day of May, 2025

Corey Floyd